## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KELLER NORTH AMERICA, INC.,** | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| **BERKEL & COMPANY CONTRACTORS, INC.** | ) <br> ) <br> )    Case No. _____ <br> ) |
| Serve: | ) <br> ) |
| c/o National Registered Agents, Inc. <br> 112 SW 7th Street, Suite 3C <br> Topeka, Kansas 66603 | ) <br> ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

COMES NOW Plaintiff, Keller North America, Inc. ("Keller" or "Plaintiff"), by and through the undersigned counsel and for its Verified Complaint for Injunctive Relief and Damages against Defendant Berkel & Company Contractors, Inc. ("Berkel"), states and alleges as follows:

### NATURE OF THIS ACTION

1.     Keller is a geotechnical specialist contractor that works with its clients to address their geotechnical challenges across the United States and worldwide. To that end, Keller maintains a team of highly trained engineers, project managers, and business developers who have a wealth of experience and provide a wide range of geotechnical techniques and optimum solutions to clients.

2.     Berkel, a competing geotechnical specialist contractor, provides services in the same space as Keller, albeit through fewer geotechnical techniques.

3.     Beginning in late August of this year, Keller unexpectedly received a stream of resignations of key employees from Keller's Alabama, Florida, Tennessee, and Maryland operations, all of whom were positioned to divert other members of Keller's workforce, along with Keller's intellectual property and business relationships, away from the Company. The resignations came in at a rate of one or two per week until the week of September 23, 2024, when the resignations accelerated, and a group of six employees resigned *en masse*.

4.     Each employee who resigned was bound by the terms of an employment agreement that included non-competition, confidentiality, customer non-solicitation, and/or employee non-solicitation restrictions, with the exception of two employees: Frank Fonseca and Jorge Malave.

5.     Each of the employees who resigned now works for direct competitor Berkel performing the same or substantially similar job as they did for Keller in the same market area in which they previously worked in direct violation of their respective employment agreements.

6.     Despite being aware of each employee's restrictions, Berkel targeted and raided Keller's employees in an effort to intentionally interfere with Keller's contractual relationships and unfairly compete against Keller in the market.  And despite being directed to cease and desist its unlawful activity on October 9, 2024, Berkel continues to employ the former Keller employees.

7.     Consequently, Keller brings this action to enjoin Berkel from interfering with its contractual relationships with its former employees and for damages and other relief.

### PARTIES AND JURISDICTION

8.     Keller is a corporation organized under the laws of the state of Delaware, with its principal place of business located at 7550 Teague Road, Suite 300, Hanover, Maryland 21076, and is therefore a citizen of the states of Delaware and Maryland.

9.    Berkel is a corporation organized under the laws of the state of Kansas, with its principal place of business located at 2649 S. 142nd Street, Bonner Springs, Kansas 66012, and is therefore a citizen of the state of Kansas.

10.    This Court has personal jurisdiction over Defendant Berkel because Berkel has its principal place of business in Kansas and because Berkel engaged in unlawful conduct in Kansas which has caused harm to Keller.

11.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant Berkel is located within this District and the events giving rise to the claims in this action occurred in substantial part in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### KELLER'S BUSINESS OPERATIONS

13.    Keller is a geotechnical specialist contractor that provides solutions to geotechnical challenges throughout the construction industry, including across commercial, institutional, mining, infrastructure, and other markets.

14.    Among other areas, Keller operates in the deep foundation construction, earth retention, and ground improvement spaces providing its design-build services, products, and solutions to customers across the country and worldwide.

15.    Keller's deep foundation services, which are required whenever soils lack the capacity to resist the required load, an existing load or a change in an existing load and involve the construction of structural elements to transfer loads down to stronger underlying soils or rock,

include (among other techniques) auger cast piles, bored piles/drilled shafts, driven cast in-situ piles, driven precast piles, screw piles, macropiles, and micropiles.

16.    Keller's earth retention services, which are used to retain earth successfully so that it does not move or shift to any unwanted directions, include (among other techniques) anchors, contiguous pile walls, micropile slide stabilization systems, secant pile walls, and sheet piles.

17.    Keller also provides ground improvement services, which can increase the load bearing capacity of the ground, reduce settlement, and improve the engineering properties of existing soils through, among other techniques, rigid inclusions, compaction grouting, pressure grouting, and deep soil mixing.

18.    Among other locations, Keller has operations in Alabama, California, Florida, Georgia, Kentucky, Maryland, Missouri, Tennessee, Texas, Utah, and Virginia.

**KELLER'S EMPLOYEES AND AGREEMENTS**

*Andres Baquerizo*

19.    In or around September 2007, Keller acquired HJ Foundation. HJ Foundation continued to operate as HJ Foundation until January 2020, when it merged with all other Keller companies under the Keller name.

20.    Andres Baquerizo was hired by HJ Foundations in or around September 2002 as an Engineering Director and Project Manager.

21.    During his tenure with HJ Foundations and Keller, Baquerizo held various positions with the Company.

22.    On or about September 21, 2007, as a term and condition of his employment with Keller during the acquisition, Baquerizo entered into an Agreement with Keller (the "Baquerizo Agreement").  A true and accurate copy of the Baquerizo Agreement is attached hereto and incorporated herein as **Exhibit 1**.

23.     The Baquerizo Agreement contains a non-competition covenant, providing, in relevant part, that:

> . . . for a period of two years after the termination or separation of Employee's employment with the Company for any reason, Employee agrees that he will not individually or jointly, directly or indirectly. . . . compete with the Company by engaging in the construction of deep foundations, including but not limited to augered piling, excavation shoring and vibro compaction or replacement, in the State of Florida.

Ex. 1, Baquerizo Agreement ¶5.

24.     The Baquerizo Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 1, Baquerizo Agreement ¶¶3, 6, and 7.

25.     Baquerizo was promoted into progressively higher positions with Keller, ultimately being named as Vice President based out of Miami, Florida.

26.     During his employment with Keller, Baquerizo had responsibility for, among other things, leading the branch team in accordance with the business strategies and plans; identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and approving weekly and monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading -project-based teams.

*Nicholas Feldt*

27.     In or around September 2007, Keller acquired HJ Foundation. HJ Foundation continued to operate as HJ Foundation until January 2020, when it merged with all other Keller companies under the Keller name.

28.     Nicholas Feldt was hired by HJ Foundation Company, a Keller Company, in or around May 2011 as an intern.

29.     During his tenure with Keller, Feldt held various positions with the Company.

30.     On or about September 30, 2019, as a term and condition of his continued employment and in consideration of his participation in the Company's bonus program, Feldt entered into an Agreement with Keller (the "Feldt Agreement"). A true and accurate copy of the Feldt Agreement is attached hereto and incorporated herein as **Exhibit 2**.

31.     The Feldt Agreement contains a non-competition covenant, providing that for a one-year period following the termination of his employment with Keller, he is prohibited from working for any company, entity, or person that engaged in the "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" in (i) Miami-Dade County, Florida; (ii) Broward County, Florida; and (iii) Palm Beach County, Florida. Ex. 2, Feldt Agreement ¶¶1, 2.2, 3.1.

32.     The Feldt Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 2, Feldt Agreement ¶¶3.1.

33.     Feldt was promoted into progressively higher positions with Keller, ultimately being named as Senior Project Manager based out of Miami, Florida.

34.     During his employment with Keller, Feldt had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies

while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading -project-based teams.

### *Elison Garcia*

35.     Elison Garcia was hired by HJ Foundation Company, a Keller Company, in or around October 2017 as an intern.

36.     During his tenure with Keller, Garcia held various positions with the Company.

37.     On or about September 30, 2019, as a term and condition of his continued employment, Garcia entered into an Agreement with Keller (the "Garcia Agreement"). A true and accurate copy of the Garcia Agreement is attached hereto and incorporated herein as **Exhibit 3**.

38.     The Garcia Agreement contains a non-competition covenant, providing that for a one-year period following the termination of his employment with Keller, he is prohibited from becoming employed by or performing services for any company, entity, or person that engaged in the "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" in (i) Miami-Dade County, Florida; (ii) Broward County, Florida; and (iii) Palm Beach County, Florida. Ex. 3, Garcia Agreement ¶¶1, 2.2, 3.1.

39.     The Garcia Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 3, Garcia Agreement ¶3.1.

40.     Garcia was promoted into progressively higher positions with Keller, ultimately being named as Project Manager based out of Miami, Florida.

41. During his employment with Keller, Garcia had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading - project-based teams.

*Matthew Hammett*

42. Matthew Hammett was hired by Hayward Baker, Inc., a Keller Company, in or around May 2005 as a Field Engineer.

43. During his tenure with Keller, Hammett held various positions with the Company.

44. On or about November 27, 2017, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Hammett entered into an Agreement with Keller (the "Hammett Agreement"). A true and accurate copy of the Hammett Agreement is attached hereto and incorporated herein as **Exhibit 4**.

45. The Hammett Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Vibro Piers, Rigid Inclusions, Driven Piles, Helical Piles, Jacks Piers, Macropiles, Micropiles, Pit Underpinning, Anchors, Sheet Piles, Soil Nailing, Soldier Piers and Lagging techniques* within the State of Tennessee. . . .

Ex. 4, Hammett Agreement, p. 2, ¶A.b.

46.    The Hammett Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 4, Hammett Agreement, p. 2, ¶A.a.

47.    Hammett was promoted into progressively higher positions with Keller, ultimately being named as Business Development Executive based out of Knoxville, Tennessee.

48.    During his employment with Keller, Hammett had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks, and setting pricing; developing sales strategies; estimating and proposal preparation, ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability.

*Joseph Mann*

49.    Joseph Mann was hired by Hayward Baker, Inc., a Keller Company in or around May 2005 as a Field Engineer.

50.    During his tenure with Keller, Mann held various positions with the Company.

51.    On or about August 27, 2020, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Mann entered into an Agreement with Keller (the "Mann Agreement").  A true and accurate copy of the Mann Agreement is attached hereto and incorporated herein as **Exhibit 5**.

52.    The Mann Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction services, which includes Geotechnical Construction services using Ground Improvement and/or Earth

> Retention techniques utilizes by Keller, within the State of Maryland
> and/or within a 50-mile radius of the District of Columbia. . . .

Ex. 5, Mann Agreement, p. 1, ¶A.b.

53.     The Mann Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 5, Mann Agreement, p. 1-2, ¶¶A.a, C.

54.     Mann was promoted into progressively higher positions with Keller, ultimately being named as Branch Manager based out of Odenton, Maryland.

55.     During his employment with Keller, Mann had responsibility for, among other things, expanding and growing markets through business development and proposal preparation; leading the branch team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers;  driving strategy to maximize profits; monitoring and approving weekly and monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading -project-based teams.

### *Justin McLaughlin*

56.     Justin McLaughlin was hired by Hayward Baker, Inc., a Keller Company, in or around July 2017 as a Field Engineer.

57.     During his tenure with Keller, McLaughlin held various positions with the Company.

58.     On or about October 22, 2018, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers,

McLaughlin entered into an Agreement with Keller (the "McLaughlin Agreement"). A true and accurate copy of the McLaughlin Agreement is attached hereto and incorporated herein as **Exhibit 6**.

59. The McLaughlin Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Jet Grouting, Deep Soi Mixing, Mass Mixing, Rigid Inclusions, Micro Piles, Earth Retention* techniques within the State of Tennessee.

Ex. 6, McLaughlin Agreement, p. 2, ¶A.b.

60. The McLaughlin Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 6, McLaughlin Agreement, p. 2-3, ¶¶A.a, C.

61. McLaughlin was promoted into progressively higher positions with Keller, ultimately being named as an Engineering Manager based out of Nashville, Tennessee.

62. During his employment with Keller, McLaughlin had responsibility for, among other things, in-house design, review, and coordination of engineering projects; interacting with clients; overseeing quality control; and managing projects, including estimating, revenue and cost reporting, project budgets, client relations, and project team management.

### *Dylan Mitchell*

63. Dylan Mitchell was hired by Hayward Baker, Inc., a Keller Company, on or about September 23, 2019, as a Project Engineer based out of Baltimore, Maryland.

64. During his tenure with Keller, Mitchell held various positions with the Company.

65.     On or about September 17, 2019, as a term and condition of his employment, Mitchell entered into an Agreement with Keller (the "Mitchell Agreement").  A true and accurate copy of the Mitchell Agreement is attached hereto and incorporated herein as **Exhibit 7**.

66.     The Mitchell Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *including Micropiles, Soil Nail, Compaction Grouting, and Ground Anchor techniques* within the State of Maryland.

Ex. 7, Mitchell Agreement, p. 2, ¶a.ii.

67.     The Mitchell Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 7, Mitchell Agreement, p. 2-3, ¶¶a.ii and c.

68.     Mitchell was promoted into progressively higher positions with Keller, ultimately being named as a Project Manager based out of Nashville, Tennessee.

69.     During his employment with Keller, Mitchell had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading - project-based teams.

*Jordan Moi*

70.     In or around June 2013, Keller Foundations, Ltd. acquired North American Construction Group.

71.     Jordan Moi was hired by Keller Foundations, Ltd., a Keller Company, on or about June 24, 2013, in connection with its acquisition of North American Construction Group, as Project Manager II.

72.     During his tenure with Keller, Moi held various positions with the Company.

73.     On or about December 7, 2016, as a term and condition of his employment and in consideration of the provision of Confidential Information to him and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Moi entered into an Agreement with Keller (the "Moi Agreement").  A true and accurate copy of the Moi Agreement is attached hereto and incorporated herein as **Exhibit 8**.

74.     The Moi Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *including Vibro Replacement, Vibro Compaction, Aggregate Piers, Soil Mixing, Micropiles, Soil Nail or Anchors techniques* within the State of Tennessee. . . .

Ex. 8, Moi Agreement, p. 2, ¶A.b.

75.     The Moi Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 8, Moi Agreement, p. 2-3, ¶¶A.a and C.

76.    On December 21, 2020, in connection with a promotion to Senior Project Manager, Moi reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Moi Agreement.  **Exhibit 9**, Moi Promotion Agreement.

77.    Moi was promoted into progressively higher positions with Keller, ultimately being named as a Project Executive based out of Nashville, Tennessee.

78.    During his employment with Keller, Moi had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks, and setting pricing; developing sales strategies; ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading - project-based teams.

### *Ricardo Picayo*

79.    Ricardo Picayo was hired by HJ Foundation Company, a Keller Company, in or around August 2008 as an Assistant Mechanical Engineer.

80.    During his tenure with Keller, Picayo held various positions with the Company.

81.    On or about July 13, 2020, in consideration of a promotion to Operations Manager, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Picayo entered into an Agreement with Keller (the "Picayo Agreement").  A true and accurate copy of the Picayo Agreement is attached hereto and incorporated herein as **Exhibit 10**.

82.    The Picayo Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *Micropiles and Soil Anchors, Vibro Compaction, Vibro Replacement, Rigid Inclusions, Soil Mixing techniques, Auger Case Piles, Drill Displacement Piles, Sheet Pile Installation and Drilled Shafts* within the State of Florida.
> . . .

Ex. 10, Picayo Agreement, p. 2, ¶A.b.

83.    The Picayo Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 10, Picayo Agreement, p. 2-3, ¶¶A.a and C.

84.    Picayo was promoted into progressively higher positions with Keller, ultimately being named as the Operations Manager, Keller Florida, based out of Miami, Florida.

85.    On October 29, 2021, in connection with this promotion, Picayo reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Picayo Agreement. **Exhibit 11**, Picayo Promotion Agreement.

86.    During his employment with Keller, Picayo had responsibility for, among other things, developing strategies and business plans for growth of Keller operations; identifying improvement initiatives to implement Keller business strategies; ensuring business plan revenue and profitability goals are defined and achieved; managing costs, capital expenditures, and equipment; and managing field and shop employees of Keller Florida.

### *Robert Scott, Jr.*

87.    Robert Scott, Jr., was hired by Hayward Baker, a Keller Company, on or about in or around March 2008 as a Senior Engineer.

88.     During his tenure with Keller, Scott held various positions with the Company.

89.     On or about June 14, 2024, in consideration of his continued employment, a one-time bonus payment and deferred compensation plan, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Scott entered into an Agreement with Keller (the "Scott Agreement").  A true and accurate copy of the Scott Agreement is attached hereto and incorporated herein as **Exhibit 12**.

90.     The Scott Agreement contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 12, Scott Agreement, p. 2-3, ¶¶A and C.

91.     Scott was promoted into progressively higher positions with Keller, ultimately being named as the Director – Engineering Services, based out of Nashville, Tennessee.

92.     During his employment with Keller, Scott had responsibility for, among other things, in-house design, review, and coordination of engineering projects; interacting with clients; overseeing quality control; and managing projects, including estimating, revenue and cost reporting, project budgets, client relations, and project team management; identifying engineering and quality control improvement initiatives across Keller.

### William Wright

93.     William Wright was hired by Keller on or about in or around January 2014 as a Field Engineer.

94.     During his tenure with Keller, Wright held various positions with the Company.

95.     On or about November 17, 2015, in consideration of a promotion to Project Engineer, his continued employment, the provision of Confidential Information to him, and the

Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Wright entered into an Agreement with Keller (the "Wright Agreement"). A true and accurate copy of the Wright Agreement is attached hereto and incorporated herein as **Exhibit 13**.

96.    The Wright Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction including Ground Improvement, Structural Systems using Vibro Replacement, Vibro Compaction, Stone Columns, Jet Grouting, Deep Soil Mixing, and Micropile techniques* within the State of Texas and any other states where the Company has performed service in any of the 3 years prior to your separation from

Ex. 13, Wright Agreement, p. 2, ¶7.a.ii.

97.    The Wright Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 13, Wright Agreement, p. 2-3, ¶7.

98.    On October 30, 2019, in connection with a promotion to Project Manager and a relocation to Birmingham, Alabama, Wright reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Wright Agreement, and agreed that the geographic scope of Paragraph 7 of the Wright Agreement would be modified as follows:

> in Paragraph 7.a.ii, replace "within the State of Texas" and "Texas" with "within 50 miles of Birmingham, Alabama (the "Alabama Area") and the State of Georgia" and "Alabama Area and Georgia," respectively. . . .

**Exhibit 14**, Wright 2019 Promotion Agreement.

99.     On February 23, 2021, in connection with a raise in his compensation, Wright again acknowledged his non-solicitation, non-competition, and confidentiality obligations under the Agreement, as amended by the Wright 2019 Promotion Agreement.  **Exhibit 15**, Wright 2021 Compensation Agreement.

100.    Wright was promoted into progressively higher positions with Keller, ultimately being named as the Senior Project Manager based out of Birmingham, Alabama.

101.    During his employment with Keller, Wright had responsibility for, among other things, expanding and growing markets through business development and proposal preparation; leading the area team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers;  driving strategy to maximize profits; and taking appropriate action to develop direct reports; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading - project-based teams.

## COMPETING COMPANY BERKEL'S BUSINESS OPERATIONS

102.    Berkel is a specialty geotechnical contractor in the deep foundation construction, earth retention, and ground improvement arenas that provides specialized foundation and construction services to its clients across the country and in the Caribbean.

103.    The company touts itself as being "one of the largest piling contractors in the U.S." and as "the most experienced designer and installer of single-pass, cast-in-place foundation systems in the U.S."

104.    According to Berkel's website, the company provides deep foundation work, including auger pressure grouted piles, infinity group piles, drilled displacement/screw piles,

limited/remote access, micropiles, energy piles, drilled shafts, driven piles, and rock anchors/tie-downs.

105.    Berkel also provides sheeting and shoring, including sheet piles, soldier piles, tie-backs, underpinning, bracing, secant and tangent walls, soil nails, and façade retention, as well as ground improvement work, such as rigid inclusions, compaction grouting, pressure grouting, and deep soil mixing.

106.    Berkel's engineering group, which includes structural and geotechnical engineers, offers design assistance, as well as full designs on the company's products and services.

107.    According to Berkel's website, the company has regional office locations in California, Florida, Georgia, Kansas, Kentucky, Maryland, Utah, Texas, and Washington D.C.

108.    In addition to its regional office locations, Berkel operates and/or maintains projects in many other locations, including, among others, Alabama and Tennessee.

109.    Berkel provides services equivalent or similar to those that Keller provides and is a direct competitor of Keller.

### BERKEL TARGETS AND RAIDS KELLER EMPLOYEES

110.    In or around August 16, 2024, Hammett resigned his position with Keller and accepted a position as the Preconstruction Director – Ground Improvement with Berkel, working from the Knoxville, Tennessee, area.

111.    On August 26, 2024, after learning that Matthew Hammett had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Hammett's post-termination contractual obligations to Keller and Hammett's direct violation of those obligations. ("**Berkel/Hammett Notice Letter**").  A true and correct copy of the Berkel/Hammett Notice Letter is attached hereto as **Exhibit 16**.

112.    In or around August 29, 2024, Mann resigned his position with Keller and accepted a position as with Berkel, working within the State of Maryland and/or within a 50-mile radius of the District of Columbia.

113.    On September 9, 2024, after learning that Mann had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Mann's post-termination contractual obligations to Keller and Mann's direct violation of those obligations. ("**Berkel/Mann Notice Letter**").  A true and correct copy of the Berkel/Mann Notice Letter is attached hereto as **Exhibit 17**.

114.    In or around September 17, 2024, McLaughlin resigned his position with Keller and accepted a position with Berkel, working from the Nashville, Tennessee, area.

115.    On September 23, 2024, after learning that Justin McLaughlin had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of McLaughlin's post-termination contractual obligations to Keller and McLaughlin's direct violation of those obligations. ("**Berkel/McLaughlin Notice Letter**").  A true and correct copy of the Berkel/McLaughlin Notice Letter is attached hereto as **Exhibit 18**.

116.    In or around August 27, 2024, Wright resigned his position with Keller and accepted a position as a Regional Manager with Berkel, working from the Birmingham, Alabama area.

117.    On September 23, 2024, after learning that William Wright had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Wright's post-termination contractual obligations to Keller and Wright's direct violation of those obligations. ("**Berkel/Wright Notice**

Letter"). A true and correct copy of the Berkel/Wright Notice Letter is attached hereto as **Exhibit 19**.

118.    On or about September 18, 2024, Dylan Mitchell resigned his position with Keller and accepted a position as a Project Manager with Berkel, working from the Nashville, Tennessee area.

119.    On or about September 23, 2024, Jordan Moi resigned his position with Keller and accepted a position with Berkel, working from the Nashville, Tennessee area.

120.    On or about September 25, 2024, Baquerizo resigned his position with Keller and accepted a position as a Vice President with Berkel, working from the Miami, Florida area.

121.    On or about September 26, 2024, Robert Scott, Jr. resigned his position with Keller and accepted a position with Berkel, working in the State of Florida.

122.    On or about September 27, 2024, Elison Garcia resigned his position with Keller and accepted a position with Berkel, working from the Miami-Dade County, Broward County, and/or Palm Beach County, Florida areas.

123.    On or about September 30, 2024, Feldt resigned his position with Keller and accepted a position with Berkel, working from the Miami-Dade County, Broward County, and/or Palm Beach County, Florida areas.

124.    On or about September 25, 2024, Ricardo Picayo resigned his position with Keller and accepted a position with Berkel, working in the State of Florida.

125.    On October 9, 2024, after learning that Andres Baquerizo, Nicholas Feldt, Elison Garcia, Dylan Mitchell, Jordan Moi, Ricardo Picayo, and Robert Scott, Jr. had accepted positions with Berkel, counsel for Keller sent a letter to Berkel, addressed to legal counsel, notifying Berkel of each of the respective employee's post-termination contractual obligations to Keller, each of

the employee's direct violations of those obligations, and demanding that each of the employees and Berkel immediately stop and correct the ongoing contractual interference and violations. ("**Berkel Cease and Desist Letter**").  A true and correct copy of the Berkel Cease and Desist Letter is attached hereto as **Exhibit 20**.

<u>**BERKEL'S UNFAIR COMPETITION CONTINUES**</u>

126.    In addition to the employees identified above, Berkel also recently hired Michael Terry, former Keller Senior Vice President, who now serves as Berkel's Executive Vice President; Frank Fonseca, former Keller Senior Vice President who worked for Keller out of the Miami area and who now serves as Berkel's Senior Vice President and works out of the Miami area; and Jorge Malave, former Keller Design Engineer who worked for Keller in the Miami area.

127.    Berkel's employment of Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Scott, and Wright within the same market areas in which each individual conducted business activities on behalf of Keller for *years* has placed Keller at an unfair competitive disadvantage because of each of these individual's extensive knowledge of Keller's confidential and proprietary information, business plans, and strategies, and their relationships with Keller customers within that market area.

128.    Despite Keller's notification to Berkel, Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Scott, and Wright remain employed by Berkel engaged in activities in direct competition with Keller.

129.    Berkel's conduct has resulted, and will continue to result, in irreparable injury and harm to Keller, including, without limitation, loss of customers, loss of good will, loss of customer confidence, loss of confidential business information, loss of trade secrets, loss of reputation, loss

of contracts with customers, loss of referral sources, loss of competitive advantage and unknown economic loss.

## COUNT I:  TORTIOUS INTERFERENCE WITH CONTRACT

130.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129 of this Verified Complaint as if fully set forth herein.

131.    The Baquerizo Agreement, Feldt Agreement, Garcia Agreement, Hammett Agreement, Mann Agreement, McLaughlin Agreement, Mitchell Agreement, Moi Agreement, Picayo Agreement, and Wright Agreement are valid and enforceable contracts.

132.    Berkel was aware of the existence of the Agreements, as well as the restrictive covenants contained therein.

133.    By hiring and continuing to employ Baquerizo to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Baquerizo and Keller, resulting in a breach of the Baquerizo Agreement.

134.    By hiring and continuing to employ Feldt to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Feldt and Keller, resulting in a breach of the Feldt Agreement.

135.    By hiring and continuing to employ Garcia to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Garcia and Keller, resulting in a breach of the Garcia Agreement.

136.    By hiring and continuing to employ Hammett to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Hammett and Keller, resulting in a breach of the Hammett Agreement.

137.    By hiring and continuing to employ Mann to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Mann and Keller, resulting in a breach of the Mann Agreement.

138.    By hiring and continuing to employ McLaughlin to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between McLaughlin and Keller, resulting in a breach of the McLaughlin Agreement.

139.    By hiring and continuing to employ Mitchell to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Mitchell and Keller, resulting in a breach of the Mitchell Agreement.

140.    By hiring and continuing to employ Moi to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Moi and Keller, resulting in a breach of the Moi Agreement.

141.    By hiring and continuing to employ Picayo to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Picayo and Keller, resulting in a breach of the Picayo Agreement.

142.    By hiring and continuing to employ Wright to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Wright and Keller, resulting in a breach of the Wright Agreement.

143.    Berkel had no justification for its intentional interference with the contracts Keller has with Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, and Wright.

144.    As a direct and proximate result of the actions of Berkel, Keller has sustained damages.

145.    The conduct of Berkel, as alleged herein, was intentional, malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keller.

## COUNT II: UNFAIR COMPETITION

146.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 145 of this Verified Complaint as if fully set forth herein.

147.    Berkel's conduct described herein constitutes an unfair method of competition.

148.    Berkel wrongfully and intentionally interfered with Keller's relationships with Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, and Wright to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

149.    Upon information and belief, Berkel wrongfully and intentionally interfered with Keller's relationships with Keller's current and former clients and customers in order to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

150.    Upon information and belief, Berkel has disclosed and/or used Keller's confidential, proprietary, and/or trade secret information, including, confidential company information in order to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

151.    Berkel's conduct interfered and continued to interfere with Keller's ability to conduct its business.

152.    As a direct and proximate result of the acts and course of conduct of Berkel described herein, Keller has suffered and will continue to suffer irreparable harm and loss, in addition to damages.

153.    The conduct of Berkel was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keller, entitling Keller to an award of punitive damages.

## COUNT III: UNJUST ENRICHMENT

154.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 153 of this Verified Complaint as if fully set forth herein.

155.    As a result of their misconduct as alleged in this Verified Complaint, Berkel has been unjustly enriched.

156.    The retention of these benefits by Berkel under the circumstances is inequitable and, therefore, Berkel should be required to disgorge their wrongful gains.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Keller North America, Inc., prays for judgment against Defendant Berkel & Company Contractors, Inc. as follows:

(a)    temporary, preliminary, and permanent injunctive relief providing:

    (i)    Enjoining Defendant Berkel & Company Contractors, Inc., for a period of one year following the date injunctive relief is first granted, from employing Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, and Wright in violation of their respective contracts with Keller;

    (ii)    Enjoining Defendant Berkel & Company Contractors, Inc., from interfering with contracts between Keller and Keller's employees;

    (iii)    directly or indirectly making use of confidential, proprietary, and trade secret information belonging to Keller;

(b)    Actual, compensatory and punitive damages in an amount to be proven at trial;

(c)    An award of reasonable attorneys' fees and costs incurred in this action;

(d)    Pre- and post-judgment interest at the maximum rate permitted by law; and

(e)    Such other and further relief as the Court deems just and proper.

## **DESIGNATION OF PLACE OF TRIAL AND JURY TRIAL DEMAND**

Plaintiff requests Kansas City, Kansas as the place of trial and demands a trial by jury as to all claims asserted herein.

Respectfully submitted,

*/s/ Laura Bailey Brown*
Laura Bailey Brown,  D. Kan. No. 78908
James C. Sullivan, D. Kan. No. 70456
Robert Wasserman, KS Bar No. 27563
**FISHER & PHILLIPS LLP**
4622 Pennsylvania Avenue, Suite 910
Kansas City, Missouri 64112
TEL: (816) 842-8770
FAX: (816) 842-8767
Email:  lkbrown@fisherphillips.com
Email:  jsullivan@fisherphillips.com
Email:  rwasserman@fisherphillips.com

ATTORNEYS FOR PLAINTIFF

## <u>VERIFICATION</u>

I declare and verify under penalty of perjury under the laws of the United States of America and the State of _____ that the foregoing is true and correct.

Executed on: ___10/17/2024_____

By: __Curtis Cook_____

Title: _Executive Vice President_____