## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KELLER NORTH AMERICA, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 24-2477-JAR-BGS** |
| **BERKEL & COMPANY CONTRACTORS, INC.,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Keller North America, Inc. ("Keller") filed this action against Defendant Berkel & Company Contractors, Inc. ("Berkel") alleging three claims: (1) tortious interference with a contract, (2) unfair competition, and (3) unjust enrichment. Those claims arise from the fall 2024 departure of eleven of Plaintiff's former employees, all of whom now work for Defendant. The matter is now before the Court on Defendant's Motion to Dismiss (Doc. 41) for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, the Court grants in part and denies in part Defendant's motion to dismiss.

### I.  Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"[1] and must include "enough facts to state a claim for relief that is plausible on its face."[2]

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235–36 (3d ed. 2004)).

[2] *Id.* at 570.

Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[3]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[4]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[5]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegation can be proven.[6]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the Court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[7]  Thus, the Court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[8]  Second, the Court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[9]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]

---

[3] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[5] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[6] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[7] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[8] *Id.* at 678–79.

[9] *Id.* at 679.

[10] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

## II.  Background

The Court takes the following facts from the Amended Verified Complaint and the exhibits attached thereto, accepts them as true, and views them in the light most favorable to Keller.[11]

Keller is a geotechnical specialist contractor ("GSC") that performs deep-foundation construction, earth retention, and ground improvement in the construction industry.  It is a Delaware corporation with its principal place of business in Maryland, but it does work across the country and worldwide—particularly, as relevant here, in Alabama, Florida, Maryland, and Tennessee.  To perform these services, Plaintiff employs engineers, project managers, and business developers, all with extensive experience in the GSC industry.  The eleven employees at issue here are those types of employees.

Berkel is also a GSC that offers the same services as Plaintiff: deep-foundation construction, earth-retention services, and ground-improvement services.  And although it is a Kansas corporation with its principal place of business in Kansas, Defendant—like Plaintiff— has offices or operations in Alabama, Florida, Maryland, and Tennessee.  Because Defendant offers the same services in the same geographic market, it is a direct competitor of Plaintiff.  The eleven employees perform substantially the same job with Defendant that they performed with Plaintiff.

The eleven employees at issue here all worked for Keller before leaving in the fall of 2024 to work for Berkel.  William Wright worked in Keller's Alabama market. Andres Baquerizo, Nicholas Feldt, Elison Garcia, and Ricardo Picayo worked in the Florida market.

---

[11] Plaintiff submitted several exhibits with the Amended Verified Complaint—all agreements between Plaintiff and the employees.  Because those are copies of a written instrument attached to the Amended Verified Complaint, they form part of that pleading and thus may be considered without converting this into a summary judgment motion.  *See* Fed. R. Civ. P. 10(c), 12(d).

Joseph Mann and Dylan Mitchell  worked in the Maryland market.  Matthew Hammett, Justin

McLaughlin, Jordan Moi, and Siavash Amirrahmat worked in the Tennessee market.  These

employees left Keller between late August and late September, and after Keller learned that

Berkel subsequently employed them, Keller sent cease-and-desist letters to Berkel's legal

counsel.  Despite those letters, Berkel continues to employ the former employees, who are

engaged in activities in direct competition with Keller.  The Court summarizes the employees'

information in this table:

| Employee | State | Dates of Employment | Date of Cease-and-Desist Letter to Defendant | Position with Plaintiff at Time of Departure |
|---|---|---|---|---|
| William Wright | Alabama | 01/2014—8/27/24 | 9/23/2024 | Senior Project Manager |
| Andres Baquerizo | Florida | 09/2002—9/25/24 | 10/9/2024 | Engineering Director & Project Manager |
| Nicholas Feldt | Florida | 05/2011—9/30/24 | 10/9/2024 | Senior Project Manager |
| Elison Garcia | Florida | 10/2017—9/27/24 | 10/9/2024 | Project Manager |
| Ricardo Picayo | Florida | 08/2008—9/25/24 | 10/9/2024 | Operations Manager |
| Joseph Mann | Maryland | 05/2005—8/29/24 | 9/9/2024 | Branch Manager |
| Dylan Mitchell | Maryland | 09/2019—09/18/24 | 10/9/2024 | Project Manager |
| Matthew Hammett | Tennessee | 05/2005—8/16/24 | 8/26/2024 | Business Development Executive |
| Justin McLaughlin | Tennessee | 07/2019—9/17/24 | 9/23/2024 | Engineering Manager |
| Jordan Moi | Tennessee | 06/2013—9/23/24 | 10/9/2024 | Project Executive |
| Siavash Amirrahmat | Tennessee | 03/2020—10/16/24 | N/A | Design Engineer |

While employed by Keller, all eleven employees worked in positions in which they had

access to Keller's confidential business information—for example, Keller's internal market

strategies, pricing information, and its contract-negotiation process—and some even had client-

facing roles, in which they generated client goodwill.  Baquerizo, for example (along with

several other employees), managed existing client relationships and built new client

relationships.

Each employee's contract with Keller contains several restrictive covenants—a noncompete, a nonsolicitation, and nondisclosure provision.  Each noncompete seeks, in essentials, to prohibit the employee from working for another company that provides geotechnical construction services.  For example, Moi's noncompete provides:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using including Vibro Replacement, Vibro Compaction, Aggregate Piers, Soil Mixing, Micropiles, Soil Nail or Anchors techniques within the State of Tennessee. . . .[12]

The Court summarizes the noncompete provisions in the following table:

| Employee | Time Limitation | Geograph Limitation | Activity Limitation |
|---|---|---|---|
| William Wright | one year | within 50 miles of Birmingham, AL and GA | "any company that is involved in the provision of services equivalent or similar to Geotechnical Construction." |
| Andres Baquerizo | two years | in FL | "engaging in the construction of deep foundations" |
| Nicholas Feldt | one year | Miami-Dade Cnty., FL; Broward Cnty., FL; Palm Beach Cnty., FL | any company engaged in "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" |
| Elison Garcia | one year | Same as above | Same as above |
| Ricardo Picayo | one year | within FL | "any company that is involved in the provision of services equivalent or similar to Geotechnical Construction." |
| Joseph Mann | one year | within MD or 50 miles of DC | Same as above |
| Dylan Mitchell | one year | within MD | Same as above |
| Matthew Hammett | one year | within TN | Same as above |
| Justin McLaughlin | one year | within TN | Same as above |
| Jordan Moi | one year | within TN | Same as above |

---

[12] Doc. 29-8 at 2.

| Siavash Amirrahmat | one year | within TN | Same as above |
|---|---|---|---|

### III. Discussion

Defendant moves to dismiss all three state-law claims Plaintiff alleges against Defendant: (1) tortious interference with a contract, (2) unfair competition, and (3) unjust enrichment. The Court discusses each in turn.

As a threshold issue, the Court must determine which state's law applies to this dispute. A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits,[13] so Kansas choice-of-law rules govern this dispute. The parties do not dispute that Kansas choice-of-law rules select Maryland law as governing this dispute.[14] Thus, the Court applies Maryland law to the state-law claims alleged in Plaintiff's Amended Complaint, discussed in turn below.

#### A.    Tortious Interference

Under Maryland law, the elements of a tortious-interference claim are "(1) existence of an enforceable contract between a plaintiff and third party, (2) defendant's knowledge of that enforceable contract, (3) defendant's intentional interference with that contract, (4) breach of that contract by the third party, and (5) resulting damages to the plaintiff."[15] Defendant moves to dismiss on the basis that Plaintiff fails to allege sufficient facts in support of the first and third elements of its claim.

---

[13] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[14] Defendant concedes for the purposes of the motion to dismiss that Maryland law applies. That concession is well founded because several cases from this district conclude that, under Kansas choice of law rules, which prescribe the *lex loci delicti*, the financial harm occurs in the state where the plaintiff's principal place of business is located. *See, e.g.*, *ORI, Inc. v. Lanewala*, 147 F. Supp. 2d 1069, 1077 n.9 (D. Kan. 2001); *Bushnell Corp. v. ITT Corp.,* 973 F. Supp. 1276, 1286 (D. Kan. 1997).

[15] *Blue Ridge*, 724 F. Supp. 3d at 409 (citing *Fowler*, 598 A.2d at 802); *see also Vane v. Nocella*, 494 A.2d 181, 192 n.6 (Md. 1985).

### 1. Enforceability of the Contracts

The parties dispute the enforceability of each employee's restrictive covenant, presenting a second choice-of-law issue: which state's law applies to determine the enforceability of the contracts?  Both parties assume without discussion that the Court must apply the *lex loci contractus*—the law of the state where each contract was made—on the subsidiary issue of the contract's enforceability.  Though not calling it by this name, the parties would apply a choice-of-law technique called "depecage"—"the application of the law of different states to different issues."[16]  So instead of applying Maryland law on the issue of enforceability, the parties would apply various states' laws: Tennessee law to the Moi, Laughlin, Hammett, and Amirrahmat agreements; Alabama law to the Wright agreement; Florida law to the Baquerizo, Garcia, Picayo, and Feldt agreements; and Maryland law to the Mann and Mitchell agreements.  Some of those states have more stringent rules about the enforceability of restrictive covenants than others.[17]

Kansas choice-of-law rules do not approve of depecage.  The Court finds no decisions by the Kansas Supreme Court authorizing its use, and the Restatement (First) of Conflict of Laws, which Kansas generally relies on,[18] does not condone its use either.[19]  Instead, the First

---

[16] *Depecage, Black's Law Dictionary* (12th ed. 2024); *Perkins v. Chris Hunt Water Hauling Contractor, Inc.*, 46 F. App'x 903, 905 (10th Cir. 2002).

[17] *See* Fla. Stat. § 542.335(1)(b), (c) (2024) (listing valid protectable interests and describing reasonableness); Ala. Code § 8-1-190(b)(5) (2023) (same); *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984) (requiring that restrictive covenants be construed in employee's favor).

[18] *Wingerd v. Kaabooworks Servs., LLC*, No. 18-2024, 2019 WL 1587177, at *1 (D. Kan. Apr. 12, 2019) (citing *In re. K.M.H.*, 169 P.3d 1025, 1031 (Kan. 2007)).

[19] Absent from the First Restatement, depecage (or issue-by-issue analysis) became a feature of the Second Restatement's approach when it instructed that, at least for tort causes of action, the court should conduct a choice-of-law analysis issue-by-issue.  Restatement (Second) of Conflict of Laws § 145 (Am. L. Inst. 1971) ("The rights and liabilities of the parties with respect *to an issue* in tort are determined by the local law of the state which, with respect to that *issue*, has the most significant relationship . . . ." (emphasis added)); *see Depecage: Embracing Complexity to Solve Choice-of-Law Issues*, 37 Ind. L. Rev. 303, 308 (2003) (describing role of depecage in Second Restatement).  Depecage remains foreign to jurisdictions following the First Restatement.  *See* Symeon C. Symeonides, *Issue-by-Issue Analysis and Depecage in Choice of Law: Cause and Effect*, 45 Univ. Toledo L. Rev. 751, 751–53 (2014) (describing First Restatement's analysis as applying one choice-of-law rule to all issues).

Restatement prescribes one choice-of-law rule for the whole claim, which applies even to its subsidiary issues. Because the Court siting in diversity must follow Kansas choice-of-law rules,[20] the Court does not apply depecage to this cause of action. In other words, under Kansas choice-of-law rules, a single choice-of-law rule applies to the tortious interference claim—the *lex loci deliciti*—and to all its issues. And both parties agree for the purpose this motion that here, the place of the wrong is Maryland. Maryland law therefore governs the tortious-interference claim and also the subsidiary issue of the enforceability of the contracts.

To be enforceable under Maryland law, a restrictive covenant must (1) protect an employer's legitimate interest, (2) be no wider in scope than "reasonably necessary" to protect the employer's interest, (3) not impose an "undue hardship" on the employee, and (4) not violate public policy.[21] Defendant primarily argues that the restrictive covenants fail the first and second requirements.[22] The enforceability of restrictive covenants is predominantly a factual one; reasonableness in particular must be determined based on "the facts of a given case."[23]

---

[20] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[21] *Blue Ridge Risk Partners, LLC v. Willem*, 724 F. Supp. 3d 398, 404 (D. Md. 2024) (internal quotation marks omitted) (quoting *Seneca One Fin., Inc. v. Bloshuk*, 214 F. Supp. 3d 457, 461 (D. Md. 2016)).

[22] Defendant also argues that the restrictive covenants fail because they would "result in injury to the public welfare." Doc. 42 at 12. The Court understands that to target the fourth element of the enforceability test. Though Defendant applies the law where the contracts were signed, it cites Kansas law for this argument. Whatever Kansas law has to say on the subject, Maryland law—which applies to this claim—makes clear that "the public has an interest in the enforcement of reasonable restrictive covenants." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 435 (D. Md. 2024) (internal quotation marks omitted) (quoting *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 642 (D. Md. 1998)). This element of the restrictive covenants' enforceability is resolved, therefore, by the second element—whether the restrictive covenants are reasonable. As discussed in the next section, Plaintiff sufficiently pled that the restrictive covenants are reasonable.

[23] *Fowler v. Printers II, Inc.*, 598 A.2d 794, 800 (Md. 1991) (internal quotation marks omitted) (quoting *Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 572 (Md. 1990)); *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973) ("[A]nd, if [the scope] is not too broad on its face, the facts and circumstances of each case must be examined.").

Thus, because enforceability is a fact-laden inquiry, it is not appropriate to resolve on a motion to dismiss their enforceability, unless the restrictive covenant is facially unenforceable.[24]

### (a.)    Protectable Interest

Defendant argues that the restrictive covenants do not protect a legitimate interest of Plaintiff. But contrary to Defendant's suggestion, protectable interests are not limited to an employee's specialized training or unique knowledge. Instead, a business has a legitimate interest in protecting its confidential information that an employee gained during their employment.[25] And while confidential information does not encompass general knowledge or information widely available in the industry,[26] courts generally uphold as a protectable interest "nonpublic commercial information that provides a clear economic advantage to the employer by virtue of its confidentiality."[27] Further, a business has a protectable interest in the goodwill its employees have generated during the course of their dealings with its customers.[28] So when employees are responsible for "maintaining, soliciting, and developing client relationships,"[29] the employer has a protectable interest in "preventing an employee from using the contacts established during employment to pirate the employer's customers."[30]

---

[24] *See Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 877 (D. Kan. 2019) ("[A] factual question [is] not ordinarily subject to resolution on a motion to dismiss." (internal quotation marks omitted) (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998))).

[25] *See* Restatement (First) of Employment Law § 8.07(b)(1) (Am. L. Inst. 2015) (defining a "protectable interest as including "protectable confidential information").

[26] *See id.* § 8.07 cmt. b ("An employer cannot protect as confidential information . . . that has entered the public domain and information that would be considered part of the general experience, knowledge, training, and skills that an employee acquires in the course of employment.").

[27] *Id.*

[28] *Medispec, Ltd. v. Chouinard*, 133 F. Supp. 3d 771, 774 (D. Md. 2015).

[29] *Wachovia Ins. Servs. v. Hinds*, No. WDQ-07-2114, 2007 WL 6624661, at *6 (D. Md. Aug. 30, 2007).

[30] *Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 515 (Md. 1990) ("Persons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers.").

Plaintiff has plead protectable interests. First, Plaintiff alleges that all the employees here had access to Plaintiff's confidential business information, and the restrictive covenants serve to protect that information. In particular, the employees had access to internal market strategies, financial reports, cost estimates for proposals, and pricing information. Some employees—Mann, for example—even prepared proposals for projections. That internal information is not general information in the public domain. And they are not conclusory, "generic assertions of confidential information"—as Defendant repeatedly asserts.[31] Second, several employees had client-facing roles in which they maintained and developed client relationships. Baquerizo, for example, built relationships with clients and negotiated contracts and otherwise generally interfaced with clients. Feldt, Garcia, Hammett, McLaughlin, Mitchell, Moi, and Scott also interacted with clients and developed client relationships while working for Plaintiff. That client goodwill that the employees generated while working for Plaintiff is a protectable interest. Plaintiff has plausibly alleged that the restrictive covenants protect legitimate interests.

### (b.)    Reasonableness

To be enforceable, a restrictive covenant must also be no wider than reasonably necessary to protect the employer's interests.[32] This is usually a factual inquiry—unfit for resolution on a motion to dismiss—unless the restriction's scope is facially unreasonable.[33] The scope must be reasonable in three aspects: time, location, and activity.[34] "Maryland courts have found a time restriction of two or more years to be reasonable . . . ."[35] A restrictive covenant with a

---

[31] Doc. 42 at 9.

[32] *See, e.g., Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 598 F. Supp. 3d 348, 359 (D. Md. 2022).

[33] *See Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 441 (4th Cir. 2004) (first citing *Holloway*, 572 A.2d at 518; and then citing *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973)).

[34] Restatement (First) of Employment Law § 8.06 cmt. c (Am. L. Inst. 2015).

[35] *ICENY USA, LLC v. M&M's, LLC*, 421 F. Supp. 3d 204, 220 (D. Md. 2019) (collecting cases).

geographic scope limited to a single state is not facially unreasonable; in fact, even nationwide restrictive covenants have been upheld under Maryland law where the competitors serve nationwide markets.[36]

The restrictive covenants here are not facially unreasonable.  First, all the restrictive covenants here impose a time restriction of two years or less,[37] so the temporal scope of the restrictive covenants is not facially unreasonable.  Second, as for the activity restriction, Defendant does not develop any argument that the noncompetes' activity restrictions are facially unreasonable; in fact, it only offers arguments and law addressing the noncompetes' temporal and geographic scope.  The Court therefore does not find at this initial stage that the restrictive covenants' activity limitations are facially unreasonable.

The parties dispute whether the geographic scope of the restrictive covenants are reasonable.  Eight of the noncompete provisions feature language like this: "You will refrain from employment on behalf of any company that is involved in the provision of services . . . within the State of Florida."  (Each particular noncompete swaps out "Florida" with the relevant state.)  The parties offer different interpretations of this language: Plaintiff argues that "within the State of Florida" modifies "company," so that the employee is prohibited from working for any company in Florida that provides geotechnical services.  Defendant argues that "within the State of Florida" modifies "provision of services," so that the employee is prohibited from working for any company that provides geotechnical services in Florida—even companies not

---

[36] *See, e.g.*, *Allegis Grp., Inc. v. Jordan*, No. GLR-12-2535, 2014 WL 2612604, at *6 (D. Md. June 10, 2014) ("[T]he provision's prohibition of competition throughout the United States and Canada is not wider in scope than reasonably necessary to protect Aerotek's business or goodwill."); *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 642 (D. Md. 1998) ("Because of the broad nature of the market in which Intelus operates, a restrictive covenant limited to a narrow geographic area would render the restriction meaningless." (citing *Hekimian Labs., Inc. v. Domain Sys., Inc.*, 664 F. Supp. 493 (S.D. Fla. 1987))).

[37] The Tennessee, Alabama, and Maryland agreements have one-year restrictions; the Florida agreements, two-year restrictions.

located in Florida.  Under Defendant's reading, the noncompetes' geographic scope expands considerably—they become nationwide noncompetes.

Ascertaining the geographic scope of those noncompetes requires the Court to interpret those provisions.  But neither party develops an argument justifying their respective interpretations.  Defendant flatly says that "read literally," the provision creates a nationwide noncompete.  And Plaintiff simply reiterates throughout the brief that the noncompetes are limited to companies in the respective States.  The Court declines at this stage of the litigation to embark on the task of interpreting these provisions when the parties have not fully briefed the issue.  And even if the Court were inclined to find these provisions ambiguous, it would be inappropriate for the Court to resolve any ambiguity—a factual question—on a motion to dismiss.[38]  Regardless, these noncompete provisions are not facially unreasonable even under Defendant's expansive reading because Plaintiff operates in a nationwide market.[39]

Three of the noncompete provisions do not feature the arguably expansive language discussed above, so Plaintiff has still plead that these three contract include a reasonable geographic scope.  For example, Baquerizo's noncompete provision prohibits him from "engaging in the construction of deep foundations . . . in the State of Florida."[40]  As noted above, a statewide restriction is not facially unreasonable.  Defendant tries to transform that statewide *noncompete* provision into a nationwide noncompete by citing Baquerizo's *nonsolicitation* restriction.  Whatever geographic limitation the nonsolicitation provision may (or may not) have

---

[38] *See City of Bowie v. Mie Props., Inc.*, 922 A.2d 509, 525 n.16 (Md. 2007) ("When ambiguity is found in a contract, it becomes a question of fact to decipher the intent of the parties in forming the instrument." (first citing *McLean, Koehler, Sparks & Hammond v. Schnepfe*, 524 A.2d 86, 91 (Md. 1987); and then citing *Shapiro v. Massengill*, 661 A.2d 202, 208 (Md. Ct. Spec. App. 1995))).

[39] *See supra* note 36.

[40] Doc. 29-1 ¶ 5.

does not bear on the noncompete's geographic scope, which, by its plain terms, is limited to Florida.  Feldt and Garcia's noncompetes also feature a statewide geographic scope.  Under their noncompetes they agree to "refrain from . . . within [(i) Miami-Dade County, Florida, (ii) Broward County, Florida, and (iii) Palm Beach County, Florida], becoming employed by any Competitor."  Those provisions—limiting the noncompete to several Florida counties—are not facially unreasonable.

### 1.  Intentional Interference

Defendant also argues that Plaintiff has failed to allege the third element of tortious interference—"defendant's intentional interference with that contract."[41]  Though phrased as "intentional interference," the tort requires that the interference be "wrongful."[42]  Tortious interference with a contract arises in two scenarios: either a defendant "induces a breach of an existing contract," or "absent a breach of contract, there is malicious or wrongful interference with an economic relationship."[43]  Aside from what the tortious interference must cause—that is, the contract's breach—the defendant must also have both tortious intent and interfere through a wrongful act.[44]  Tortious intent may be satisfied by alleging that "the defendant intentionally induced the breach or termination of the contract" to either (1) "harm the plaintiff" or (2) "benefit the defendant at the expense of the plaintiff."[45]  The exact wrongful act that is required

---

[41] *Blue Ridge Risk Partners, LLC v. Willem*, 724 F. Supp. 3d 398, 409 (D. Md. 2024) (citing *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Ct. Spec. App. 1991)).

[42] *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins.*, 511 A.2d 492, 498 (Md. 1986).

[43] *Id.* at 496–97.

[44] *Cf. Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994) (requiring both tortious intent and a wrongful act to state a claim for tortious interference with economic relations); *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994).("To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct."); *Travelers Indem. Co. v. Merling*, 605 A.2d 83, 90 (Md. 1992) ("For one to recover for tortious interference with contractual . . . relations, the interference must have been wrongful or unlawful.").

[45] *Macklin*, 639 A.2d at119.

13

to show a tortious interference is "incapable of precise definition"[46] and may encompass a range of conduct.[47]  Some examples are a defendant's use of "violence, intimidation, injurious falsehood or other fraud, [or] violat[ing] the criminal law."[48]  But this basic requirement remains: "to be actionable, the improper or wrongful conduct must induce the breach or termination of the contract."[49]

Plaintiff, however, argues that a tortious-interference claim does not require that a defendant induce a party to breach its contract.  Instead, according to Plaintiff, it is enough that the defendant "knowingly 'engages the employee to work for it in an activity which would mean a violation of the contract not to compete.'"[50]  Plaintiff's argument comes from *Fowler v. Printers II*, which noted that such a rule comports with "the approach . . . taken by the Court of Appeals."[51]  Though Plaintiff correctly states *Fowler*'s holding, the rule is nevertheless in tension with cases from Maryland's highest court, which call for a defendant to induce a party to breach or terminate its contract.[52]  Regardless of *Fowler*'s applicability here, this Court is bound to follow the decisions of Maryland's highest court, not of its intermediate court,[53] and will

---

[46] *Id.* (citing *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 973–74 (Md. 1989)).

[47] *Id.* (noting that a plaintiff may show tortious interference "by showing that [defendant] used violence, intimidation, injurious falsehood or other fraud").

[48] *Id.*

[49] *Id.* (citing *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins.*, 511 A.2d 492, 496–97 (Md. 1986)).

[50] *Fowler v. Printers II, Inc.*, 598 A.2d 794, 804 (Md. Ct. Spec. App. 1991).

[51] *Id.*

[52] *See, e.g.*, *Macklin*, 639 A.2d at 119; *Sharrow*, 511 A.2d at 496–97.

[53] When ascertaining state law, a federal court sitting in diversity, the Court must look to the rulings of the state's highest court, and only where no controlling state decision exists does the Court predict how the state's highest court would rule.  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007) ("The federal court must follow the most recent decisions of the state's highest court." (citing *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003))).

therefore follow the Maryland high court's admonition that "to be actionable, the improper or wrongful conduct must induce the breach or termination of the contract."[54]

Plaintiff fails to plausibly allege that Defendant improperly interfered with the employees' restrictive covenants. Plaintiff's allegations that Defendant improperly interfered with the restrictive covenants rest solely on Defendant's continued employment of the employees, despite receiving notice from Plaintiff that the employees were parties to restrictive covenants.[55] That allegation is insufficient because it does not allege that Defendant induced the employees' breaches in the first place. But even if it had alleged inducement to breach, the allegation would still be insufficient because it does not allege that Defendant induced the breach through some wrongful act. Plaintiff does not allege any act taken by Defendant (other than employment itself) that induced the employees to breach the restrictive covenants, let alone a *wrongful* act that induced them to breach. Although "wrongful act" is a malleable term, the Court cannot conclude that the mere hiring and continued employment of an employee who is a party to a restrictive covenant is a wrongful act in the same league as violence, intimidation, fraud, or even undue pressure. Plaintiff fails to allege an element of the tortious-interference claim, so it fails to state a claim for tortious interference. The Court thus grants Defendant's motion to dismiss the tortious interference claim.

### B. Unfair Competition

Maryland law has not identified the exact elements of an unfair-competition claim.[56] And that make sense: the facts and circumstances surrounding an unfair-competition claim may

---

[54] *Macklin*, 639 A.2d at 119 (citing *Sharrow*, 511 A.2d at 496–97).

[55] Doc. 29 ¶¶ 149–160.

[56] For example, the tort "is not limited to 'passing off' one's goods as those of a competitor." *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002) (first citing *GAI*

not lend themselves to a uniform formulation of the claim.[57]  But the claim does have some

boundaries, and courts must avoid "extending the meaning of unfair competition to cover acts

which may be unethical yet not illegal."[58]  In contrast to a tortious-interference claim, unfair

competition does not require a wrongful act that induces a breach; instead, the claim imposes

liability for "damaging or jeopardizing another's business *by fraud, deceit, trickery or unfair*

*methods*."[59]  And although unfair competition may overlap substantially with tortious

interference, dismissal of an unfair-competition claim does not "automatically follow" dismissal

of a tortious-interference claim.[60]  The touchstone for an unfair-competition claim remains "the

principles of old-fashioned honesty.  One [person] may not reap where another has sown, nor

gather where another has strewn."[61]

    Construing the Amended Complaint in the light most favorable to Plaintiff, the Court

concludes that Plaintiff has plausibly alleged a claim for unfair competition.  Several allegations

work together to support that conclusion.  First, despite knowing of the employees' restrictive

---

*Audio of New York, Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975); and then citing *Edmondson Vill. Theatre, Inc. v. Einbinder*, 116 A.2d 377, 379 (Md. 1955)).

   [57] *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 343 (Md. 1943) ("What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. . . . subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. Wherever . . . these elements of fair trade are . . . lacking equity will grant protection against the offending party." (citing *Foss v. Culbertson*, 136 P.2d 711, 717 (Wash. 1943))).

   [58] *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 134 (D. Md. 2020) (quoting *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017)).

   [59] *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 374 (Md. Ct. Spec. App. 1983) (emphasis added) (quoting *Balt. Bedding Corp.*, 34 A.2d at 342); *see also ClearOne Advantage, LLC v. Kersen*, No. JKB-23-03446, 2024 WL 4754051, at *6 (D. Md. Nov. 12, 2024) (discussing contours of unfair-competition claim).

   [60] *MedServ Int'l, Inc. v. Rooney*, No. CV AW-05-3173, 2006 WL 8457075, at *3 (D. Md. June 28, 2006); *Waypoint Mgmt. Consulting, LLC v. Krone*, No. ELH-19-2988, 2022 WL 2528465, at *60 (D. Md. July 6, 2022) ("[U]nfair competition is not a 'fallback' tort that can save [a plaintiff] from its failure to establish tortious interference . . . ." (quoting *Command Tech., Inc. v. Lockheed Martin Corp.*, No. 0469, 2015 WL 6470277, at *8 (Md. Ct. Spec. App. Oct. 27, 2025))).

   [61] *Waypoint Mgmt.*, 2022 WL 2528465, at *60 (internal quotation marks omitted) (quoting *GAI Audio.*, 340 A.2d at 748).

covenants, Defendant continues to employee them, and second, Defendant has used Plaintiff's confidential information—obtained through these employees—to gain an unfair competitive edge in the market and thus jeopardize Plaintiff's business.  Defendant moreover has used these employees to interfere with Plaintiff's relationships with its current and former clients.  For example, at least three employees (Baquerizo, Hammett, and Wright) have participated in bid processes with customers that they worked with while employed by Plaintiff.  And some of those employees have intimate knowledge of Plaintiff's business plans and strategies, pricing, contract-negotiation process, estimating, and preparing proposals.  Merely employing several employees whom Defendant knows are parties to restrictive covenants might not be an unfair method that damages another's business, but using those employees—and their knowledge of Plaintiff confidential information—to gain a competitive market edge by employing them in bid processes with their former clients plausibly alleges an unfair method that damages Plaintiff's business.[62]  Mindful that Plaintiff must only plead facts sufficient to "nudge[]" the claim "across the line from conceivable to plausible,"[63] the Court concludes that Plaintiff has plausibly alleged a claim for unfair competition.  The Court denies Defendant's motion to dismiss the unfair-competition claim.

## C. Unjust Enrichment

To state a claim for unjust enrichment under Maryland law, a plaintiff must allege "(1) [a] benefit conferred upon the defendant by the plaintiff; (2) [a]n appreciation or knowledge by

---

[62] *Cf. Brightview Grp.*, 441 F. Supp. 3d at  135 (finding likelihood of success on unfair-competition claim where defendant used plaintiff's former employees to access "sensitive . . . business information" to compete against plaintiff); *see also Sirius Fed., LLC v. Jelen*, No. 22-CV-00223-LKG, 2023 WL 2213929, at *13 (D. Md. Feb. 24, 2023) (dismissing unfair-competition claim that only alleged that defendant "misus[ed]" plaintiff's confidential information); *Waypoint Mgmt.*, 2022 WL 2528465, at *61 (noting that, in unfair-competition claim against a subsequent employer, plaintiff could prevail given that an employee "leveraged his access to . . . client information to undercut [plaintiff's] pricing").

[63] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

the defendant of the benefit; and (3) [t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value."[64]

Defendant argues that Plaintiff has failed to allege a claim for unjust enrichment because it fails to state a claim for tortious interference and so has not alleged that it would be inequitable for Defendant to retain any benefit.[65]  The Court disagrees.  Although Plaintiff fails to state a claim for tortious interference, the Court nevertheless concludes that it plausibly alleges inequity through the same allegations that support its unfair-competition claim: that Defendant knew of the employees' restrictive covenants and continued to employ them, while using the confidential information, client information, and client goodwill gained from the employees to obtain a market advantage—even going so far as using some employees in bidding processes with clients they had served while working for Plaintiff.  The Court finds that those facts plausibly allege that it would be inequitable for Defendant to retain the benefit here.

The Court denies Defendant's motion to dismiss the unjust-enrichment claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss (Doc. 41) is **granted in part and denied in part**.  The Court grants Defendant's motion

---

[64] *Eastland Food Corp. v. Mekhaya*, 301 A.3d 308, 332 (Md. 2023) (internal quotation marks omitted) (alterations in original) (quoting *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)).

[65] Defendant makes no argument that Plaintiff fails to allege a conferred a benefit on it—other than to put "benefit" in scare quotes.  Doc. 42 at 15 ("[T]here would be nothing inequitable in Berkel maintaining any 'benefit' conferred on it by Plaintiff.").  Nevertheless, the Amended Verified Complaint alleges sufficient facts that give rise to support a reasonable inference that the benefit conferred here was the confidential information and client goodwill that the employees brought to Defendant (which it has used in bid proposals against some of the employees' former clients).  Doc. 29 ¶ 168.  *See Swedish Civil Aviation Admin. v. Project Mgmt. Enter., Inc.*, 190 F. Supp. 2d 785, 793 (D. Md. 2002) ("Confidential information and other non-monetary assets can be a benefit conferred in an unjust enrichment claim."); Restatement (Third) of Restitution and Unjust Enrichment § 47 (Am. L. Inst. 2011) (describing benefit conferred on defendant through third party); *id.* § 48 ("Cases of nonmoney benefits may be decided by analogy.")

to dismiss Plaintiff's claim for tortious interference.  The Court otherwise denies Defendant's motion.

The preliminary-injunction hearing scheduled for February 24, 2025, remains set. Though the Court dismisses the tortious-interference claim, the Court construes the Amended Verified Complaint (Doc. 29) as also seeking a preliminary injunction based on the remaining claims for unfair competition and unjust enrichment.  The Court anticipates that the parties will present evidence for those claims that will be essentially the same as—if not identical to—the evidence for the tortious-interference claim.  Further, the Court will move forward with the hearing, particularly given Plaintiff's opportunity to seek leave to amend and cure the deficiencies in its tortious-interference claim.

**IT IS SO ORDERED.**

Dated: February 21, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE