IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**KELLER NORTH AMERICA, INC.,**

        **Plaintiff,**

        **v.**
                                 **Case No. 24-2477-JAR-BGS**

**BERKEL & COMPANY
CONTRACTORS, INC.,**

        **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Keller North America, Inc. ("Keller") brings claims for unfair competition and unjust enrichment against Berkel & Company Contractors, Inc. ("Berkel") stemming from the departure of some of its former employees, all of whom now for Berkel.[1]  Before the Court is Keller's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 5).[2]  The Court held an evidentiary hearing on this motion on February 24–25 and March 10–11, 2025. Having fully considered the briefs and the evidence presented at the hearing, the Court is prepared to rule.  As described more fully below, the Court denies Keller's motion for a preliminary injunction.

## I.  Preliminary Injunction Standard

Fed. R. Civ. P. 65(a) authorizes the Court to issue a preliminary injunction.  A preliminary injunction "is an extraordinary remedy," so "the right to relief must be clear and unequivocal."[3]  "A plaintiff seeking a preliminary injunction must establish that he is likely to

---

[1] Doc. 29.  Plaintiff's claim for tortious interference with a contract has been dismissed.  *See* Doc. 54.

[2] The Court has already ruled on the motion for a temporary restraining order.  Doc. 31.

[3] *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[4]  This standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."[5]  The Court makes the following findings of facts and conclusions of law under Fed. R. Civ. P. 52(a)(2) in support of its decision to deny Keller's motion for preliminary injunction.[6]

## II.     Facts

In 2024 Berkel wanted to grow its business by starting some new offices—one in Nashville, another in Miami—and by expanding its ground-improvement services.  To achieve those goals, Berkel hired some employees who formerly worked for Keller, a competitor in ground-improvement services: Siavash Amirrahmat, Andres Baquerizo, Nicholas Feldt, Elison Garcia, Matthew Hammett, Joseph Mann, Justin McLaughlin, Dylan Mitchell, Jordan Moi, Ricardo Picayo, Bob Scott, and William Wright.  The Employees were bound by various restrictive covenants, including agreements not to compete, not to solicit (customers or employees), and not to disclose confidential information.[7]  To challenge these hirings, Keller brought this suit against Berkel.

---

[4] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[5] *Id.* at 21.

[6] *See Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 890 n.3 (10th Cir. 2013) ("The district court identified the harms it thought salient, attributed weight to them, and concluded that the balance did not favor granting an injunction.  This is sufficient and consonant with the well-settled principle that the district court 'need only make brief, definite, pertinent findings and conclusions upon the contested matters.'" (quoting *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204 (10th Cir. 2007))).

[7] Bob Scott's agreement does not contain a noncompetition clause.  Ex. 14 at 2.

### Keller's and Berkel's Operations

Keller and Berkel are competing geotechnical construction companies. Keller offers various foundation services, including earth retention, deep-foundation construction, and ground improvement. Keller ordinarily acts as a subcontractor, so its clients are primarily general contractors, though a small percentage of its work is with owners and developers. Keller has no exclusive contracts with any of those clients.

In 2020, Keller embarked on a corporate restructuring called "One Keller." In that restructuring, Keller brought under a single umbrella its several subsidiary companies, which each had different local cultures and operating structures. A few years later, Keller combined several different business units into two "mega" units. One of those units—the South Central Business Unit—comprises (1) the "TAGM" branch, which covers Tennessee, Alabama, Georgia, and Maryland, and (2) the Florida branch, which has offices in central and southern Florida.[8] In southern Florida, Keller's Miami office employed fifteen individuals before the Employees departed.

Berkel is also a geotechnical construction company that offers services similar to Keller—in particular, deep-foundation construction and ground improvement. Berkel and Keller compete against each other for deep-foundation and ground-improvement projects. Berkel has offices across the country, but before 2024, Berkel did not have a Nashville office. And though Berkel had an office in Miami in the '70s and '80s, the office's leadership left in the late '80s, and the office began to struggle. Berkel tried to reignite the Miami office in the early 2000s, and eventually in 2024, Berkel's President, Greg Righter, started discussions about developing Berkel's Miami presence and returning the office to its former strength.

---

[8] The South Central Business Unit covers other territories not relevant in this case.

*Ground-Improvement Services*

Geotechnical construction companies like Keller and Berkel have increasingly been called on to use ground improvement instead of deep-foundation construction. A deep foundation project requires the contractor to construct a foundation in the soil with foundation elements (for example, piles), that will support a building's weight. In contrast, ground improvement shores up the soil itself, so that it can support more of the building's weight without the foundation elements. So instead of requiring a deep foundation, the soil—improved through various ground-improvement techniques like aggregate piers, rigid inclusions, vibro piers, and deep-soil mixing—can support a spread foundation, which in turn supports the building.

Owners and developers reap some benefits from using ground improvement over a deep foundation. Ground improvement services are cheaper than deep foundations and can proceed with a site permit rather than the more laborious permitting requirement for deep foundations. Ground improvement is generally subject to fewer regulations than deep foundations, which are highly regulated. Recognizing these benefits, the market is shifting toward ground improvement and away from deep foundations, particularly for construction of data centers and large warehouses. Amazon, for example, strongly prefers (if not requires) ground improvement for its projects. And Berkel has seen an increasing demand from its existing customers for stone column projects—a ground-improvement technique.

In response to those market demands, Keller and Berkel offer ground improvement. But Berkel has not always performed ground-improvement services. For many years, Keller's competitors in the ground-improvement space were three other companies: Menard, Earthtek, and Malcom. And, Keller presented evidence that Berkel has had little presence in ground

improvement; Berkel has had only two projects in Atlanta and Alabama, both several years ago. Berkel had historically focused on deep foundations in the augered cast piling industry. But Greg Righter testified that within the last ten to fifteen years, Berkel began doing ground-improvement projects and in August 2023 completed its biggest ground-improvement project.

So, with an interest in starting new offices and a demand for ground improvement, Berkel saw an opportunity to expand. But the expansion would require new employees, and, coincidentally, some Keller employees had recently started considering opportunities with other employers. Starting in 2020, Keller began taking several actions that caused dissatisfaction and discontent among the employees. The "One Keller" restructuring in 2020 imposed uniformity that upset some employees, many of whom had spent their decades-long careers with these local subsidiary companies and regretted that their local cultures would be replaced by a more uniform corporate culture. Keller also reworked its bonus structure: bonuses, which were formerly uncapped, would now be capped. This cap rankled employees (particularly those in a high-performing market like Florida) who might hit their bonus cap early in the year and then face the prospect of a flatlined bonus for the remainder of the year. Frank Fonseca testified that his bonus would be reduced by around 50%, and Andres Baquerizo testified that his bonus faced a nearly 70% reduction. And finally, in 2023, Keller made key personnel changes. Keller combined several business units—Southeast, Florida, and Central—into one mega unit called the South Central Business Unit. The Southeast, Florida, and Central business units each had senior vice presidents at their helms: Art Pengelly for the Central unit, Mike Terry for the Southeast unit, and Frank Fonseca for the Florida unit. In the wake of the reorganization, Keller fired Pengelly and Terry in March 2023. Fonseca alone remained.

5

These changes troubled many of the Employees.  Several disliked the loss of the subsidiary companies' local cultures.  Many objected to the capped bonuses.  And several feared that they, like Terry, might be pushed out after devoting decades of their career to the company. Though staying at Keller for the time being, many employees began to entertain employment opportunities with other employers.

### Recruiting in TAGM

Nearly a year after being fired, Terry joined Berkel.  Terry worked at Keller as Senior Vice President for the Southeast Business Unit, which covered Tennessee, Alabama, Georgia, and Maryland.  After Keller informed Terry that it would terminate his employment in March 2023, Terry agreed to continue working for Keller until June 2023.  At that point, he signed a severance agreement that contained a covenant not to compete against Keller or solicit Keller employees for one year after his departure; it would expire on July 1, 2024.  In the intervening year, Terry did not work.  But Terry entertained the idea that he would, at the expiration of his noncompete, reenter the geotechnical-construction scene.  So in August, he met with Berkel's president, Greg Righter, and over the next several months, Terry and Righter had extensive discussions about Terry joining Berkel.

Those discussions were successful.  On March 4, 2024, Righter made an offer to Terry, which Terry signed on May 5, 2024, after several weeks of negotiation.  But Terry agreed on this condition: he would not begin work until his noncompete expired on July 1, 2024.  The offer letter set out some of Terry's key responsibilities: "recruit . . . talent for . . . potential new office locations" and "develop geotechnical services not currently offered by Berkel,"[9] which Terry understood to include expanding Berkel's ground-improvement services.

---

[9] Ex. 28.

After he started at Berkel in July 2024, Terry began to strategize about the new offices and the increased ground-improvement offerings. In August, he discussed with Righter some thoughts about new offices. He mentioned Keller employees interested in coming over to Berkel, and that Berkel would need to "reach out" to some folks "to flesh out a business plan in South [Florida]" and "start up the core of a new Nashville presence."[10] And he noted some possible ground-improvement expansions: putting Justin McLaughlin "in charge of [ground improvement] design for Berkel";[11] hiring Mehdi Mohammadrajabi, a "very skilled [ground improvement] designer"; and enlisting Joe Mann, who viewed ground improvement as an opportunity to "develop[] new products/market segments (Data Centers, etc.) to build something fun and new."[12] Terry also suggested that Matt Hammett could come lead Berkel's preconstruction efforts for ground-improvement projects.

His nonsolicitation agreement having expired, Terry soon talked with several of those Keller employees, many of whom he had developed close relationships with while he was at Keller. Terry discussed opportunities with Matt Hammett in July, after Hammett had reached out to Terry because of his frustrations at Keller. Terry also had discussions with the following employees after the August strategy email with Righter: Justin McLaughlin (Nashville), Dylan Mitchell (Nashville), Jordan Moi (Nashville), Bob Scott (Nashville), William Wright (Birmingham), and Joe Mann (Silver Spring). Siavash Amirrahmat—also in Nashville—reached out to Terry in late September to discuss possible employment at Berkel. All these individuals worked at Keller at the time they talked with Terry. And with the exception of Moi, they all had done work in ground improvement.

---

[10] Ex. 30.

[11] *Id.*

[12] *Id.*

These employees eventually joined Berkel.  Hammett, Mann, and Wright accepted their offers in August; Scott, McLaughlin, Mitchell, and Moi accepted in September; and Amirrahmat accepted in October.  Their offer letters noted their new position at Berkel and detailed what their key responsibilities would be.  Hammett, for example, would join the Knoxville office as "Pre-Construction Director-Ground Improvement," where he would "identify opportunities for Berkel regional offices to utilize ground improvement techniques (rigid inclusions and stone columns)."[13]  In the Nashville office would be McLaughlin as "Chief Engineer-Ground Improvement"[14] and Mitchell, who would "help bid, negotiate, and manage ground improvement projects."[15]  Wright would remain in Birmingham, where he would "bid, negotiate, and manage operations for stone column projects"[16] for the southeast US region.  The remaining employees, though their responsibilities do not mention ground improvement related duties, had experience in ground improvement.[17]

### *Recruiting in Florida*

Frank Fonseca joined Berkel in September 2024.  At Keller, Fonseca was Senior Vice President of the Florida Business Unit; he was the Florida counterpart to Terry.  Fonseca left Keller to join Berkel, and several of his former Keller employees joined him at Berkel.  Terry sent Fonseca a wine basket on July 10, and the two spoke by phone the next day.  That same day, Fonseca's frustrations with Keller growing, he texted Righter to see if Berkel was hiring and, over the following weeks, had several more conversations with Righter.  Terry checked in with

---

[13] Ex. 34 at 1.

[14] *Id.* at 5.

[15] *Id.* at 6.

[16] *Id.* at 2.  Several witnesses characterized stone columns as a ground-improvement technique.

[17] Moi is the exception; he did not specifically work in ground improvement.

Righter on August 18 about the Miami plans: "are things moving forward here?" "Offer in Frank's hands yet?"[18]  The offer was in Fonseca's hands; Righter had sent the offer a few days earlier on August 14.  After weeks of discussions and a revised offer, Fonseca resigned from Keller and joined Berkel on September 23.  He joined as a senior vice president and would "establish, build and manage Berkel's 'South Florida' region," and "coordinate and strategize with Berkel's existing operation in Florida."[19]

To build Berkel's Miami office, Fonseca would need new employees.  He already had some in mind.  Two months before he joined Berkel, Fonseca had discussed with Righter a possible role for Fonseca in Miami, and Fonseca memorialized that discussion in an email—and a spreadsheet titled "Big B 2024."  (Big B refers to Berkel.)  That spreadsheet set out strategic thoughts about building a Berkel office in Miami.  For example, Fonseca queried the cost of renting a shop and office in Miami, offered a plan to "immediately go to current Keller contracts and try to get them to switch[,] maybe we get 10%,"[20] and listed some Keller employees that he could bring with him.[21]  For a Miami office, the spreadsheet listed the initials of Andres Baquerizo, Jose Delgado, Ricky Picayo, and Mike Meneses.  The spreadsheet also included those employees' salaries—calculated by adding a 5.4% increase to some base salary—bonuses, 401k contributions, and car allowances.  For the rest of Florida, the spreadsheet suggested some

---

[18] Ex. 31.

[19] Ex. 45 at 2.

[20] Ex. 41 at 3.

[21] Fonseca testified that he sent this spreadsheet to "scare Berkel"—with its "big scary number"—and see whether it was prepared to make an investment in the Florida market.  He further explained that, though he listed the initials of various employees, the initials were only placeholders; he did not have a plan to bring those particular employees with him to Berkel.  The Court does not find that testimony credible.  Fonseca solicited every one of those employees, except Baquerizo, and he even included notes about the specific employees: "Player A" (identified as Baquerizo) "may need to do $271k bonus" and "Player E" (identified as Filjones) "may need to do $210k bonus."

additional employees—Jeremiah Filjones, Dustin Walkenhorst, and Jorge Malave—and included their salaries, bonuses, 401k contributions, and car allowances.

Having resigned from Keller and being free of his nonsolicitation agreement, Fonseca started discussions with several Keller employees. And he started with the employees on the spreadsheet. The same day he joined Berkel, Fonseca asked Baquerizo, Delgado, Picayo, and Meneses to meet him in Doral. Fonseca told Delgado the plan: he would open a Berkel office in Miami with some Keller employees. That same day, Fonseca had offers ready for Picayo, Delgado, and Meneses.[22] He did not need an offer letter for Baquerizo, because Baquerizo already had one in hand: Righter had sent a revised offer to him on September 17.[23]

Baquerizo and Picayo signed; Delgado and Menses did not. Baquerizo accepted his offer on September 25 as a vice president and would "[h]elp establish, build and manange Berkel's 'South Florida' region" and "[c]oordinate and strategize with Berkel's existing operation in Florida."[24] He would also work on offering new ground-improvement services. Picayo joined Berkel as an operations manager and would "[m]anage operations for Berkel's 'South Florida' region."[25] Fonseca also sent offer letters to Nicholas Feldt, Elison Garcia, and Jorge Malave to join the Miami office. They all accepted on September 26 or 27. With those hires, Fonseca built the groundwork for Berkel's new Miami office. And he let potential clients know: "I am now bringing Berkel back to South Florida."[26]

---

[22] Ex. 51.

[23] Ex. 46.

[24] Ex. 54 at 2.

[25] *Id.* at 6.

[26] Ex. 56.

*The Employee's restrictive covenants*

Terry and Fonseca succeeded in building Berkel's new offices and expanding its ground-improvement capabilities. But the Employees who came to Berkel had all signed restrictive covenants with Keller. The following employees had noncompetition agreements that restricted them from working for a competitor in certain territories. The table summarizes these agreements:

| Employee | Time Limitation | Geographic Limitation | Activity Limitation |
|---|---|---|---|
| William Wright | one year | within 50 miles of Birmingham, AL and GA | "any company that is involved in the provision of services equivalent or similar to Geotechnical Construction." |
| Andres Baquerizo | two years | in FL | "engaging in the construction of deep foundations" |
| Nicholas Feldt | one year | Miami-Dade Cnty., FL; Broward Cnty., FL; Palm Beach Cnty., FL | any company engaged in "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" |
| Elison Garcia | one year | Same as above | Same as above |
| Ricardo Picayo | one year | within FL | "any company that is involved in the provision of services equivalent or similar to Geotechnical Construction." |
| Joseph Mann | one year | within MD or 50 miles of DC | Same as above |
| Dylan Mitchell | one year | within MD | Same as above |
| Matthew Hammett | one year | within TN | Same as above |
| Justin McLaughlin | one year | within TN | Same as above |
| Jordan Moi | one year | within TN | Same as above |
| Siavash Amirrahmat | one year | within TN | Same as above |

Though many of the Employees work out of offices in the restricted territories (Wright, for example, works out of the Birmingham office), they avoid working on projects in those

restricted areas. As a first principle, Berkel instructed and expects the Employees to honor their noncompetes and nonsolicitation agreements with Keller. Righter testified about that expectation, and several offer letters acknowledge it.[27] So, for example, when an employee receives an alert for an invitation to bid on a project within their restricted territory, the employee passes the alert to someone who is not restricted. Wright, for example, forwarded an alert because he was could not "chase this job based on its location."[28] The Employees follow the same practice for emails with general contractors and geotechnical consultants. To take one example, Mann, in response to an inquiry by a geotechnical consultant, responded that "due to a non-compete agreement I have with my previous employer, I cannot be involved in the bid."[29] And another example from Hammett: "per my agreement . . . I will not be working on any Tennessee projects."[30] Terry frequently reminds the employees to "stay vigilant with the restricted areas . . . ensure that [the employees] are excluded from any discussion of this project."[31]

### Impacts on Keller

The Employees' departures have affected Keller's operations. The departing employees had a wealth of experience—most had decades of it—and Keller has had difficulty replacing that loss of institutional knowledge and experience. As a result, Keller has faced difficulty meeting project timelines, so it has had to ask some clients for extensions in order to get the work done.

---

[27] Ex. 34, Wright letter ("We would modify your work territory to exclude the restricted area . . . ."); Mann letter (same); Scott letter (same); Mitchell letter (same); Moi letter ("Your work territory would exclude the restricted areas . . . ."); Amirrahmat letter ("We expect you to honor the non-solicition [agreement]."); Ex. 54, Garcia letter ("Your work territory would exclude the restricted area . . . ."); Picayo letter (same); Feldt letter (same)

[28] Ex. 867.

[29] Ex. 66.

[30] Ex. 827.

[31] Ex. 841.

As things stand now, Keller anticipates a 15–20% drop in the South Florida branch's operating profit.  But, as Keller executives Curtis Cook and Joe Persichetti testified, Keller has nevertheless remained on sure footing.  Keller has not, in the wake of the departures, lost any customers or contracts, seen a reduced volume of business, or lost goodwill.  In fact, Jeremiah Filjones, who oversees Keller's Miami office, told clients that losing the employees would make little difference to the services it provided.

III.    **Discussion**

Keller requests the following preliminary injunction:

A.    Defendant Berkel & Company Contractors, Inc. ("Berkel") shall not employ Andres Baquerizo, Nicolas Feldt, Elison Garcia, Matthew Hammett, Joseph Mann, Justin McLaughlin, Jordon Moi, Ricardo Picayo, William Wright, and Siavash Amirrahmat in positions in which they are performing the same or substantially similar work for Berkel as they did while they were employed by Keller within the geographic territories identified in each employee's respective contract with Keller, including in offices located within the applicable territories.

B.    Berkel shall not allow the aforenamed employees to directly or indirectly solicit, service, or otherwise perform work for or on behalf of any customer of Keller with which the employees worked or about whom the employees received confidential information while they were employed by Keller.

C.    Berkel shall not allow the aforenamed employees to directly or indirectly, either in conjunction with others or on their own account, take any action to: (i) induce or attempt to induce any customer of Keller to terminate its relationship with Keller, (ii) otherwise interfere with or disrupt Keller's relationship with its

customers; or (iii) solicit, divert or take away business from Keller as to any

customer.

D.     Berkel shall not allow the aforenamed employees, Michael Terry, or Frank

Fonseca to take any action to induce or attempt to induce any employee of Keller

to quit employment with Keller or otherwise interfere with or disrupt Keller's

relationship with its employees.

E.     Defendant Berkel shall not directly or indirectly use, disclose, or destroy any

confidential, proprietary, or trade-secret information belonging to Keller.

**A.     Likelihood of Success on the Merits**

Keller seeks a preliminary injunction on the basis of its likelihood of success on its

unfair-competition claim only.  As discussed in the Court's previous Memorandum and Order,[32]

Maryland law applies to this cause of action, so the Court uses Maryland law to determine

Keller's likelihood of success on the merits of the unfair-competition claim.

Maryland law has not identified the exact elements of an unfair-competition claim.[33]

That is because an unfair-competition claim is highly fact-bound, so the claim is not susceptible

of uniform formulation.[34]  But the claim does have some boundaries, and courts must avoid

"extending the meaning of unfair competition to cover acts which may be unethical yet not

---

[32] Doc. 54.

[33] For example, the tort "is not limited to 'passing off' one's goods as those of a competitor."  *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002) (first citing *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975); and then citing *Edmondson Vill. Theatre, Inc. v. Einbinder*, 116 A.2d 377, 379 (Md. 1955)).

[34] *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 343 (Md. 1943) ("What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. . . . subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. Wherever . . . these elements of fair trade are . . . lacking equity will grant protection against the offending party." (citing *Foss v. Culbertson*, 136 P.2d 711, 717 (Wash. 1943))).

illegal."[35]  The claim imposes liability for "damaging or jeopardizing another's business *by fraud, deceit, trickery or unfair methods*."[36]  And the touchstone for an unfair-competition claim remains "the principles of old-fashioned honesty.  One [person] may not reap where another has sown, nor gather where another has strewn."[37]

The Court finds that Keller has not demonstrated a likelihood of success on its claim for unfair competition.  The evidence does not show (and the Court does not understand Keller to contend) that Berkel used fraud, deceit, or trickery to effect unfair competition.  Instead, Keller's claim rests on the last option—an unfair method.  But Keller fails to offer evidence that Berkel used an unfair method of competition to damage it.

Keller suggests several possible unfair methods of competition.  First, Keller urges that Berkel's use of its confidential information, which Berkel obtained through the Employees, constitutes an unfair method of competition.  But the evidence does not show that Berkel is using Keller's confidential information.  Keller identified several categories of possible confidential information—its internal financial information, market projections, and market strategies—but offered no evidence that the Employees took any of that information to Berkel or that Berkel is using any of that confidential information.  Focusing on financial information at the hearing, Keller offered evidence that some of the Employees would have access to "Power BI," which includes information about Keller's contract margins, profitability on projects in the South Central Business unit, and how profitable Keller is with particular clients.

---

[35] *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 134 (D. Md. 2020) (quoting *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017)).

[36] *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 374 (Md. Ct. Spec. App. 1983) (emphasis added) (quoting *Balt. Bedding Corp.*, 34 A.2d at 342); *see also ClearOne Advantage, LLC v. Kersen*, No. JKB-23-03446, 2024 WL 4754051, at *6 (D. Md. Nov. 12, 2024) (discussing contours of unfair-competition claim).

[37] *Waypoint Mgmt. Consulting, LLC v. Krone*, No. ELH-19-2988, 2022 WL 2528465, at *60 (internal quotation marks omitted) (quoting *GAI Audio.*, 340 A.2d at 748).

But even if the Employees had access to the information while working at Keller, Keller offered no persuasive evidence that the Employees brought the information with them to Berkel. Keller points first to Baquerizo's continued possession of hard drives after he had left Keller and joined Berkel. Having discovered that he still possessed Keller hard drives, Baquerizo alerted Keller's legal counsel, David Pietsch, who instructed Baquerizo to return them. Baquerizo conferred with Righter about how to return the hard drives, and was told to hand them over to the Polsinelli law firm's Miami office. But instead, because an impending hurricane had closed Polsinelli's Miami office, Baqueriao destroyed them with a hatchet. This may have been a lapse of judgment, but the Court finds that Baquerizo does not continue to possess the hard drives even while employed by Berkel.[38]  Second, Keller points to an email chain in which Fonseca, several days before he left Keller, requested market forecasts about Keller's Florida operations. Those forecasts included information about Keller's projects in Florida, including the projects' contract margins, likelihood of award, and revenue. But Keller offered no evidence that Fonseca took those market forecasts with him. In fact, Keller's corporate representative, Curtis Cook, admitted that Keller has no evidence that any of the Employees took or otherwise downloaded financial information about projects with them when they departed Keller. Nor did Keller offer evidence that, even if the Employees brought confidential information, Berkel has used any confidential information. The Court finds that Keller has not shown that Berkel used an unfair method based on confidential information.

Keller suggests a second method of unfair competition: that Berkel—acting through Righter, Terry, and Fonseca—induced the Employees to leave Keller and work for Berkel in

---

[38] And if Baquerizo intended to abscond with the hard drives, as Keller maintains, informing Keller that he possessed them was a poor way to hide them.

violation of the Employees' noncompete agreements.  At the time of the Employees' departures, neither Terry nor Fonseca were subject to nonsolicitation agreements.  And the evidence does not make a strong showing that Terry or Fonseca caused the Employees to leave.  Many of the Employees sought out new opportunities at Berkel, independent of acts by Righter, Terry, or Fonseca.  Stunned by Keller's decision to fire Terry, Wright for example began interviewing with other construction companies and reached out to Terry himself.  Others, like Baquerizo, upset by the capped bonuses, began to look for employment elsewhere.  The evidence offered at the hearing demonstrated that many of the employees already entertained plans to leave Keller and reached out on their own to come to Berkel; Berkel did not induce them to leave and work for it.

Keller raises a final method of unfair competition: that Berkel—again, acting through Righter, Terry, and Fonseca—recruited the key employees of Keller's Miami office to establish its own Miami office and to recruit key employees to jumpstart its own ground-improvement services.  In other words, Keller is guilty of "employee raiding."[39]  Plaintiff argues that Maryland has not addressed whether corporate raiding will support an unfair-competition claim, so it pivots toward Tenth Circuit and other state law, ostensibly to show a general trend of authority that the Court should follow.[40]  But when the cited cases discuss unfair competition, they do not focus on the defendant's hiring alone; they focus on the defendant's exploiting confidential information brought by the employees or poaching the plaintiff's existing customers—conduct that Berkel has not engaged in.  For example, in *Atlantic & Pacific*

---

[39] Doc. 57 at 7.

[40] *MidAmerica Constr. Mgmt., Inc. v. MasTec. N. Am., Inc*., 436 F.3d 1257, 1262 (10th Cir. 2006) (explaining that where a state's highest court has not decided an issue, a federal court should consider, *inter alia*, "the decisions of the federals courts and of other state courts, and the general weight and trend of authority" (quoting *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 987 (10th Cir. 2001))).

*Insurance v. Combined Insurance Co. of America*, the court upheld a damages award for unfair competition where an employer induced employees to leave in order to obtain the competitor's confidential information and subsequently use it against them.[41]  But, as explained above, Keller's evidence does not show that Berkel has exploited access to Keller's confidential information or poached Keller's existing customers.  Though Keller may, given more time for discovery, eventually prevail on this employee-raiding theory, it has not, at this stage, made the showing that it is likely to prevail on the merits.

In sum, the evidence does not support that Berkel used an unfair method of competition to damage Keller's business.  Berkel did not hire the Employees in order to steal away Keller's confidential information, and it has not used any confidential information against Keller.  Nor did Berkel induce the employees to violate their noncompetes by leaving Keller and joining Berkel; many of the employees independently decided to leave and reached out to Terry to explore opportunities at Berkel.  Finally, Berkel did not commit unlawful "employee raiding" by poaching Keller's key employees in the Miami office or ground-improvement space to use confidential information against Keller or poach Keller's existing customers or projects.

Because the Court finds that Keller has failed to show an unfair method used to damage it, Keller has not demonstrated a likelihood of success on its unfair-competition claim.

---

[41] 312 F.2d 513, 515 (10th Cir. 1962); *see also CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1064 (S.D. Ind. 2010) (finding, "in the context of other facts," unfair-competition claim likely successful when competitor aimed to develop "crushing competitive advantage" by hiring competitor's employees who disclosed confidential information); *Perryton Wholesale, Inc. v. Pioneer Distrib. Co. of Kan.*, 353 F.2d 618, 621 (10th Cir. 1965) (finding unfair competition where defendant induced plaintiff's employees to "bring with them [plaintiff's] customers, routes, and business methods").

## B.    Irreparable Harm

Keller argues that it will suffer irreparable harm without the requested injunctive relief. To constitute irreparable harm, the injury "must be both certain and great."[42]  It "is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'"[43]  "[L]oss of customers, loss of goodwill, and further erosion of [the plaintiff's] competitive position in the . . . industry . . . . are the types of factors that district courts should consider when deciding whether a plaintiff has shown a sufficient probability of irreparable harm."[44]  However, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm [because] such losses are compensable by monetary damages."[45]

Keller argues that without a preliminary injunction it will face irreparable harm by Berkel's use of its confidential information, the loss of goodwill, the loss of customers and projects, and an anticipated loss of operating profits.  The Court finds that Keller has not made the required showing of irreparable harm.  As explained above, Keller has not shown that Berkel has access to Keller's confidential information, let alone that it is using that information.  Nor has Keller provided evidence that it is likely to lose customer goodwill, clients, or projects in the absence of an injunction.  To the contrary, it offered evidence of the opposite.  Cook testified that Keller has lost no customers or projects because of the Employees' departures.  It has not seen a reduced volume of business.  And Keller's goodwill with its customers has not diminished.

---

[42] *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[43] *Id.* (quoting *Am. Hosp. Ass'n v. Harris*, 625 F. 2d 1328, 1331 (1980)).

[44] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1271 (10th Cir. 2018) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004)).

[45] *Ditucci v. Bowser*, 985 F.3d 804, 811 (10th Cir. 2021) (quoting *Schrier v. Univ. of Colo*., 427 F.3d 1253, 1267 (10th Cir. 2005)) (collecting cases).

Keller also argues that it faces irreparable harm because it anticipates a 15–20% drop in the Florida branch's operating profits at some point in the future. But those lost profits are speculative—not the *certain* injury required to justify preliminary injunctive relief.[46]

Keller makes a final argument that the mere loss of talented employees, and the ensuing delays from their departures, satisfies irreparable harm. But that argument falls flat. Keller's business has remained stable throughout the Employees' departures, and Keller has replaced many of the departing employees (albeit with individuals who have less experience). In any event, at this stage, it has faced no downstream consequences from losing those employees and offers little evidence that it is likely to face them in the future. As explained, the record shows that its business volume remains the same; it has lost no customers or projects.

The Court finds that Keller has failed to show that it is likely to face irreparable harm in the absence of an injunction.

### C.    Balance of Harms

Plaintiff's balance-of-harms argument rehashes its irreparable-injury argument: Plaintiff stands to lose customers, goodwill, and confidential information without an injunction, while Defendants will escape unharmed. The Court disagrees. First, as explained above, Plaintiff's evidence has not shown that it will lose customers, goodwill, or confidential information without an injunction. And on the other side of the ledger, Defendant—and the Employees—would face a serious burden from Plaintiff's request to enjoin the employees not just from working on projects in their noncompetes' restricted areas but from working in their current offices in the restricted territory. That request would put these employees out of work, absent relocation

---

[46] *Prairie Band*, 253 F.3d at 1250 (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

outside the restricted territory. The cost to Berkel of issuing the requested injunction are tangible and far outweighs the speculative harm to Keller if the Court does not grant the motion.

### D.    Public Interest

Plaintiff argues that fair competition is in the public interest and that because Defendant continues to engage in unfair competition, the public interest weighs in favor of the preliminary injunction. Thus, as argued, this prong overlaps with the first prong addressing the merits of Keller's unfair-competition claim. And as discussed above, Keller has not made a strong showing, at this juncture, that Berkel has engaged in unfair competition. So Keller has failed to show that the public interest weighs in its favor.

In sum, the Court finds that Keller fails to make the requisite showing on any of the four factors the Court must apply to determine that preliminary injunctive relief is warranted. Accordingly, Keller's motion for preliminary injunction must be denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Keller's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 5) is **denied**.

**IT IS SO ORDERED.**

Dated: March 26, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE