## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KELLER NORTH AMERICA, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:24-cv-02477 |
| ) | |
| **BERKEL & COMPANY CONTRACTORS, INC.** ) | |
| ) | |
| Defendant. ) | |

## SECOND AMENDED COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

COMES NOW Plaintiff, Keller North America, Inc. ("Keller" or "Plaintiff"), by and through the undersigned counsel and for its Second Amended Complaint for Injunctive Relief and Damages against Defendant Berkel & Company Contractors, Inc. ("Berkel"), states and alleges as follows:

### NATURE OF THIS ACTION

1.  Keller is a geotechnical specialist contractor that works with its clients to address their geotechnical challenges across the United States and worldwide. To that end, Keller maintains a team of highly trained engineers, project managers, and business developers who have a wealth of experience and provide a wide range of geotechnical techniques and optimum solutions to clients.

2.  Berkel, a competing geotechnical specialist contractor, provides services in the same space as Keller, albeit through fewer geotechnical techniques and with smaller geographic scope.

3.      Beginning in late August 2024, Keller unexpectedly received a stream of resignations of key employees from Keller's Alabama, Florida, Tennessee, and Maryland operations, all of whom were positioned to divert other members of Keller's workforce, along with Keller's intellectual property and business relationships, away from the Company. The resignations came in at a rate of one or two per week until the week of September 23, 2024, when the resignations accelerated, and a group of six employees resigned *en masse*.

4.      Each employee who resigned was bound by the terms of an employment agreement that included non-competition, confidentiality, customer non-solicitation, and/or employee non-solicitation restrictions, with the exception of two employees: Frank Fonseca and Jorge Malave.

5.      Each of the employees who resigned now works for direct competitor Berkel performing the same or substantially similar job as they did for Keller in the same market area in which they previously worked in direct violation of their respective employment agreements.

6.      Despite being aware of each employee's restrictions, Berkel targeted and raided Keller's employees in an effort to intentionally interfere with Keller's contractual relationships and unfairly compete against Keller in the market.  And despite being directed to cease and desist its unlawful activity on October 9, 2024, Berkel continues to employ the former Keller employees.

7.      Consequently, Keller brings this action to enjoin Berkel from interfering with its contractual relationships with its former employees and for damages and other relief.

## PARTIES AND JURISDICTION

8.      Keller is a corporation organized under the laws of the state of Delaware, with its principal place of business located at 7550 Teague Road, Suite 300, Hanover, Maryland 21076, and is therefore a citizen of the states of Delaware and Maryland.

9.      Berkel is a corporation organized under the laws of the state of Kansas, with its principal place of business located at 2649 S. 142nd Street, Bonner Springs, Kansas 66012, and is therefore a citizen of the state of Kansas.

10.      This Court has personal jurisdiction over Defendant Berkel because Berkel has its principal place of business in Kansas and because Berkel engaged in unlawful conduct in Kansas which has caused harm to Keller.

11.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant Berkel is located within this District and the events giving rise to the claims in this action occurred in substantial part in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### KELLER'S BUSINESS OPERATIONS

13.      Keller is a geotechnical specialist contractor that provides solutions to geotechnical challenges throughout the construction industry, including across commercial, institutional, mining, infrastructure, and other markets.

14.      Among other areas, Keller operates in the deep foundation construction, earth retention, and ground improvement spaces providing its design-build services, products, and solutions to customers across the country and worldwide.

15.      Keller's deep foundation services, which are required whenever soils lack the capacity to resist the required load, an existing load or a change in an existing load and involve the construction of structural elements to transfer loads down to stronger underlying soils or rock,

include (among other techniques) auger cast piles, bored piles/drilled shafts, driven cast in-situ piles, driven precast piles, screw piles, macropiles, and micropiles.

16.     Keller's earth retention services, which are used to retain earth successfully so that it does not move or shift to any unwanted directions, include (among other techniques) anchors, contiguous pile walls, micropile slide stabilization systems, secant pile walls, and sheet piles.

17.     Keller also provides ground improvement services, which can increase the load bearing capacity of the ground, reduce settlement, and improve the engineering properties of existing soils through, among other techniques, rigid inclusions, compaction grouting, pressure grouting, and deep soil mixing.

18.     Among other locations, Keller has operations in Alabama, California, Florida, Georgia, Kentucky, Maryland, Missouri, Tennessee, Texas, Utah, and Virginia.  These locations provide services throughout the country.

<u>**KELLER'S EMPLOYEES AND AGREEMENTS**</u>

*Andres Baquerizo*

19.     In or around September 2007, Keller acquired HJ Foundation. HJ Foundation continued to operate as HJ Foundation until January 2020, when it merged with all other Keller companies under the Keller name.

20.     Andres Baquerizo was hired by HJ Foundations in or around September 2002 as an Engineering Director and Project Manager.

21.     During his tenure with HJ Foundations and Keller, Baquerizo held various positions with the Company.

22.     On or about September 21, 2007, as a term and condition of his employment with Keller during the acquisition, Baquerizo entered into an agreement with Keller (the "Baquerizo

Agreement"). A true and accurate copy of the Baquerizo Agreement is attached hereto and incorporated herein as **Exhibit 1**.

23. The Baquerizo Agreement contains a non-competition covenant, providing, in relevant part, that:

> . . . for a period of two years after the termination or separation of Employee's employment with the Company for any reason, Employee agrees that he will not individually or jointly, directly or indirectly. . . . compete with the Company by engaging in the construction of deep foundations, including but not limited to augered piling, excavation shoring and vibro compaction or replacement, in the State of Florida.

Ex. 1, Baquerizo Agreement ¶5.

24. The Baquerizo Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 1, Baquerizo Agreement ¶¶3, 6, and 7.

25. Baquerizo was promoted into progressively higher positions with Keller, ultimately being named as Vice President based out of Miami, Florida.

26. During his employment with Keller, Baquerizo had responsibility for, among other things, leading the branch team in accordance with the business strategies and plans; identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and approving weekly and monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading -project-based teams.

*Nicholas Feldt*

27.     In or around September 2007, Keller acquired HJ Foundation. HJ Foundation continued to operate as HJ Foundation until January 2020, when it merged with all other Keller companies under the Keller name.

28.     Nicholas Feldt was hired by HJ Foundation Company, a Keller Company, in or around May 2011 as an intern.

29.     During his tenure with Keller, Feldt held various positions with the Company.

30.     On or about September 30, 2019, as a term and condition of his continued employment and in consideration of his participation in the Company's bonus program, Feldt entered into an agreement with Keller (the "Feldt Agreement").  A true and accurate copy of the Feldt Agreement is attached hereto and incorporated herein as **Exhibit 2**.

31.     The Feldt Agreement contains a non-competition covenant, providing that for a one-year period following the termination of his employment with Keller, he is prohibited from working for any company, entity, or person that engaged in the "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" in (i) Miami-Dade County, Florida; (ii) Broward County, Florida; and (iii) Palm Beach County, Florida.  Ex. 2, Feldt Agreement ¶¶1, 2.2, 3.1.

32.     The Feldt Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 2, Feldt Agreement ¶¶3.1.

33.     Feldt was promoted into progressively higher positions with Keller, ultimately being named as Senior Project Manager based out of Miami, Florida.

34.     During his employment with Keller, Feldt had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies

while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### *Elison Garcia*

35.     Elison Garcia was hired by HJ Foundation Company, a Keller Company, in or around October 2017 as an intern.

36.     During his tenure with Keller, Garcia held various positions with the Company.

37.     On or about September 30, 2019, as a term and condition of his continued employment, Garcia entered into an agreement with Keller (the "Garcia Agreement").  A true and accurate copy of the Garcia Agreement is attached hereto and incorporated herein as **Exhibit 3**.

38.     The Garcia Agreement contains a non-competition covenant, providing that for a one-year period following the termination of his employment with Keller, he is prohibited from becoming employed by or performing services for any company, entity, or person that engaged in the "business of providing ground improvement, foundation drilling, earth retention, groundwater control, and/or other geotechnical services" in (i) Miami-Dade County, Florida; (ii) Broward County, Florida; and (iii) Palm Beach County, Florida.  Ex. 3, Garcia Agreement ¶¶1, 2.2, 3.1.

39.     The Garcia Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 3, Garcia Agreement ¶3.1.

40.     Garcia was promoted into progressively higher positions with Keller, ultimately being named as Project Manager based out of Miami, Florida.

41.     During his employment with Keller, Garcia had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### Matthew Hammett

42.     Matthew Hammett was hired by Hayward Baker, Inc., a Keller Company, in or around May 2005 as a Field Engineer.

43.     During his tenure with Keller, Hammett held various positions with the Company.

44.     On or about November 27, 2017, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Hammett entered into an agreement with Keller (the "Hammett Agreement"). A true and accurate copy of the Hammett Agreement is attached hereto and incorporated herein as **Exhibit 4**.

45.     The Hammett Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Vibro Piers, Rigid Inclusions, Driven Piles, Helical Piles, Jacks Piers, Macropiles, Micropiles, Pit Underpinning, Anchors, Sheet Piles, Soil Nailing, Soldier Piers and Lagging techniques* within the State of Tennessee. . . .

Ex. 4, Hammett Agreement, p. 2, ¶A.b.

46.     The Hammett Agreement also contains restrictions on non-solicitation of customers and employees, among other provisions. Ex. 4, Hammett Agreement, p. 2, ¶A.a.

47.     On or about June 13, 2024, Hammett entered into a deferred compensation agreement with Keller (the "Hammett DC Agreement"). A true and accurate copy of the Hammett DC Agreement is attached hereto and incorporated herein as **Exhibit 21**.

48.     Among other provisions, the Hammett DC Agreement contains restrictions on non-solicitation of customers and employees, providing in relevant part:

> You will refrain from (1) contacting, soliciting any of the current or former customers of the Company, or (2) soliciting any of the employees of the Company who at the time of the separation from service are employees of the Company or who served in such capacity within the six-month period prior to your separation from service.

Ex. 21, Hammett DC Agreement, p. 2, ¶A.a.

49.     Hammett was promoted into progressively higher positions with Keller, ultimately being named as Business Development Executive based out of Knoxville, Tennessee.

50.     During his employment with Keller, Hammett had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks, and setting pricing; developing sales strategies; estimating and proposal preparation, ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability.

### *Joseph Mann*

51.     Joseph Mann was hired by Hayward Baker, Inc., a Keller Company in or around May 2005 as a Field Engineer.

52.     During his tenure with Keller, Mann held various positions with the Company.

53.     On or about August 27, 2020, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Mann entered into an Agreement with Keller (the "Mann Agreement"). A true and accurate copy of the Mann Agreement is attached hereto and incorporated herein as **Exhibit 5**.

54.     The Mann Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction services, which includes Geotechnical Construction services using Ground Improvement and/or Earth Retention techniques utilizes by Keller, within the State of Maryland and/or within a 50-mile radius of the District of Columbia. . . .

Ex. 5, Mann Agreement, p. 1, ¶A.b.

55.     The Mann Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 5, Mann Agreement, p. 1-2, ¶¶A.a, C.

56.     Mann was promoted into progressively higher positions with Keller, ultimately being named as Branch Manager based out of Odenton, Maryland.

57.     During his employment with Keller, Mann had responsibility for, among other things, expanding and growing markets through business development and proposal preparation; leading the branch team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers; driving strategy to maximize profits; monitoring and approving weekly and

monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### *Justin McLaughlin*

58.     Justin McLaughlin was hired by Hayward Baker, Inc., a Keller Company, in or around July 2017 as a Field Engineer.

59.     During his tenure with Keller, McLaughlin held various positions with the Company.

60.     On or about October 22, 2018, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, McLaughlin entered into an Agreement with Keller (the "McLaughlin Agreement").  A true and accurate copy of the McLaughlin Agreement is attached hereto and incorporated herein as **Exhibit 6**.

61.     The McLaughlin Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Jet Grouting, Deep Soil Mixing, Mass Mixing, Rigid Inclusions, Micro Piles, Earth Retention* techniques within the State of Tennessee.

Ex. 6, McLaughlin Agreement, p. 2, ¶A.b.

62.     The McLaughlin Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 6, McLaughlin Agreement, p. 2-3, ¶¶A.a, C.

63.     On or about June 10, 2024, McLaughlin entered into a deferred compensation agreement with Keller (the "McLaughlin DC Agreement").  A true and accurate copy of the McLaughlin DC Agreement is attached hereto and incorporated herein as **Exhibit 22**.

64.     Among other provisions, the McLaughlin DC Agreement contains restrictions on non-solicitation of customers and employees, providing in relevant part:

> You will refrain from (1) contacting, soliciting any of the current or former customers of the Company, or (2) soliciting any of the employees of the Company who at the time of the separation from service are employees of the Company or who served in such capacity within the six-month period prior to your separation from service.

Ex. 22, McLaughlin DC Agreement, p. 2, ¶A.a.

65.     McLaughlin was promoted into progressively higher positions with Keller, ultimately being named as an Engineering Manager based out of Nashville, Tennessee.

66.     During his employment with Keller, McLaughlin had responsibility for, among other things, in-house design, review, and coordination of engineering projects; interacting with clients; overseeing quality control; and managing projects, including estimating, revenue and cost reporting, project budgets, client relations, and project team management.

### *Dylan Mitchell*

67.     Dylan Mitchell was hired by Hayward Baker, Inc., a Keller Company, on or about September 23, 2019, as a Project Engineer based out of Baltimore, Maryland.

68.     During his tenure with Keller, Mitchell held various positions with the Company.

69.     On or about September 17, 2019, as a term and condition of his employment, Mitchell entered into an Agreement with Keller (the "Mitchell Agreement").  A true and accurate copy of the Mitchell Agreement is attached hereto and incorporated herein as **Exhibit 7**.

70.     The Mitchell Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *including Micropiles, Soil Nail, Compaction Grouting, and Ground Anchor techniques* within the State of Maryland.

Ex. 7, Mitchell Agreement, p. 2, ¶a.ii.

71.     The Mitchell Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 7, Mitchell Agreement, p. 2-3, ¶¶a.ii and c.

72.     Mitchell was promoted into progressively higher positions with Keller, ultimately being named as a Project Manager based out of Nashville, Tennessee.

73.     During his employment with Keller, Mitchell had responsibility for, among other things, project management, identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### *Jordan Moi*

74.     In or around June 2013, Keller Foundations, Ltd. acquired North American Construction Group.

75.     Jordan Moi was hired by Keller Foundations, Ltd., a Keller Company, on or about June 24, 2013, in connection with its acquisition of North American Construction Group, as Project Manager II.

76.     During his tenure with Keller, Moi held various positions with the Company.

77.     On or about December 7, 2016, as a term and condition of his employment and in consideration of the provision of Confidential Information to him and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Moi entered into an Agreement with Keller (the "Moi Agreement").  A true and accurate copy of the Moi Agreement is attached hereto and incorporated herein as **Exhibit 8**.

78.     The Moi Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *including Vibro Replacement, Vibro Compaction, Aggregate Piers, Soil Mixing, Micropiles, Soil Nail or Anchors techniques* within the State of Tennessee. . . .

Ex. 8, Moi Agreement, p. 2, ¶A.b.

79.     The Moi Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 8, Moi Agreement, p. 2-3, ¶¶A.a and C.

80.     On December 21, 2020, in connection with a promotion to Senior Project Manager, Moi reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Moi Agreement.  **Exhibit 9**, Moi Promotion Agreement.

81.     Moi was promoted into progressively higher positions with Keller, ultimately being named as a Project Executive based out of Nashville, Tennessee.

82.     During his employment with Keller, Moi had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks, and setting pricing; developing sales strategies; ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### Ricardo Picayo

83.     Ricardo Picayo was hired by HJ Foundation Company, a Keller Company, in or around August 2008 as an Assistant Mechanical Engineer.

84.     During his tenure with Keller, Picayo held various positions with the Company.

85.     On or about July 13, 2020, in consideration of a promotion to Operations Manager, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Picayo entered into an Agreement with Keller (the "Picayo Agreement"). A true and accurate copy of the Picayo Agreement is attached hereto and incorporated herein as **Exhibit 10**.

86.     The Picayo Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *Micropiles and Soil Anchors, Vibro Compaction, Vibro Replacement, Rigid Inclusions, Soil Mixing techniques, Auger Case Piles, Drill Displacement Piles,*

*Sheet Pile Installation and Drilled Shafts* within the State of Florida.

. . .

Ex. 10, Picayo Agreement, p. 2, ¶A.b.

87.     The Picayo Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 10, Picayo Agreement, p. 2-3, ¶¶A.a and C.

88.     Picayo was promoted into progressively higher positions with Keller, ultimately being named as the Operations Manager, Keller Florida, based out of Miami, Florida.

89.     On October 29, 2021, in connection with this promotion, Picayo reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Picayo Agreement. **Exhibit 11**, Picayo Promotion Agreement.

90.     During his employment with Keller, Picayo had responsibility for, among other things, developing strategies and business plans for growth of Keller operations; identifying improvement initiatives to implement Keller business strategies; ensuring business plan revenue and profitability goals are defined and achieved; managing costs, capital expenditures, and equipment; and managing field and shop employees of Keller Florida.

### *Robert Scott, Jr.*

91.     Robert Scott, Jr., was hired by Hayward Baker, a Keller Company, on or about in or around March 2008 as a Senior Engineer.

92.     During his tenure with Keller, Scott held various positions with the Company.

93.     On or about June 14, 2024, in consideration of his continued employment, a one-time bonus payment and deferred compensation plan, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Scott entered into an Agreement with Keller (the "Scott

Agreement"). A true and accurate copy of the Scott Agreement is attached hereto and incorporated herein as **Exhibit 12**.

94. The Scott Agreement contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 12, Scott Agreement, p. 2-3, ¶¶A and C.

95. Scott was promoted into progressively higher positions with Keller, ultimately being named as the Director – Engineering Services, based out of Nashville, Tennessee.

96. During his employment with Keller, Scott had responsibility for, among other things, in-house design, review, and coordination of engineering projects; interacting with clients; overseeing quality control; and managing projects, including estimating, revenue and cost reporting, project budgets, client relations, and project team management; identifying engineering and quality control improvement initiatives across Keller.

*William Wright*

97. William Wright was hired by Keller in or around January 2014 as a Field Engineer.

98. During his tenure with Keller, Wright held various positions with the Company.

99. On or about November 17, 2015, in consideration of a promotion to Project Engineer, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Wright entered into an Agreement with Keller (the "Wright Agreement"). A true and accurate copy of the Wright Agreement is attached hereto and incorporated herein as **Exhibit 13**.

100. The Wright Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction including Ground Improvement, Structural Systems using Vibro Replacement, Vibro Compaction, Stone Columns, Jet Grouting, Deep Soil Mixing, and Micropile techniques* within the State of Texas and any other states where the Company has performed service in any of the 3 years prior to your separation from service. . . .

Ex. 13, Wright Agreement, p. 2, ¶7.a.ii.

101.    The Wright Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 13, Wright Agreement, p. 2-3, ¶7.

102.    On October 30, 2019, in connection with a promotion to Project Manager and a relocation to Birmingham, Alabama, Wright reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Wright Agreement, and agreed that the geographic scope of Paragraph 7 of the Wright Agreement would be modified as follows:

> in Paragraph 7.a.ii, replace "within the State of Texas" and "Texas" with "within 50 miles of Birmingham, Alabama (the "Alabama Area") and the State of Georgia" and "Alabama Area and Georgia," respectively. . . .

**Exhibit 14**, Wright 2019 Promotion Agreement.

103.    On February 23, 2021, in connection with a raise in his compensation, Wright again acknowledged his non-solicitation, non-competition, and confidentiality obligations under the Agreement, as amended by the Wright 2019 Promotion Agreement.  **Exhibit 15**, Wright 2021 Compensation Agreement.

104.    On or about June 10, 2024, Wright entered into a deferred compensation agreement with Keller (the "Wright DC Agreement").  A true and accurate copy of the Wright DC Agreement is attached hereto and incorporated herein as **Exhibit 23**.

105.     Among other provisions, the Wright DC Agreement contains restrictions on non-solicitation of customers and employees, providing in relevant part:

> You will refrain from (1) contacting, soliciting any of the current or former customers of the Company, or (2) soliciting any of the employees of the Company who at the time of the separation from service are employees of the Company or who served in such capacity within the six-month period prior to your separation from service.

Ex. 23, Wright DC Agreement, p. 2, ¶A.a.

106.     Wright was promoted into progressively higher positions with Keller, ultimately being named as the Senior Project Manager based out of Birmingham, Alabama.

107.     During his employment with Keller, Wright had responsibility for, among other things, expanding and growing markets through business development and proposal preparation; leading the area team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers;  driving strategy to maximize profits; and taking appropriate action to develop direct reports; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

### *Siavash Amirrahmat*

108.     Siavash Amirrahmat was hired by Keller on or about March 10, 2020, as a Design Engineer.

109.     On or about March 10, 2020, as a term and condition of his employment and in consideration of the provision of Confidential Information to him and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Amirrahmat entered into an Agreement with Keller (the "Amirrahmat Agreement").  A true and

accurate copy of the Amirrahmat Agreement is attached hereto and incorporated herein as **Exhibit 24**.

110.    The Amirrahmat Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using including *Vibro Replacement, Vibro Compaction, Jet Grouting, Deep Soil Mixing, Mass Mixing, Rigid Inclusions, Micro Piles, Earth Retention* techniques within the State of Tennessee. . . .

Ex. 24, Amirrahmat Agreement, p. 2, ¶ A.b.

111.    The Amirrahmat Agreement also contains restrictions on confidentiality, non-solicitation of customers, and non-solicitation of employees, among other provisions. Ex. 24, Amirrahmat Agreement, p. 2-3, ¶¶ A.a and C.

112.    Specifically, the Amirrahmat Agreement non-solicitation provision provides:

> You will refrain from (1) contacting, soliciting any of the current or former customers of the Company or (2) soliciting any of the employees of the Company, who at the time of the separation from service are employees of the Company, or who served in such capacity within the six-month period prior to your separation from service.

Ex. 24, Amirrahmat Agreement, p. 2, ¶ A.a.

113.    Throughout his employment with Keller, Amirrahmat worked as a Design Engineer out of Nashville, Tennessee.

114.    During his employment with Keller, Amirrahmat had responsibility for, among other things, providing engineering support to the estimating department in bid preparation, preparing detailed design calculations and overseeing the production of drawings for construction, providing engineering support to the project managers during the construction process for various

projects, developing tools/programs to improve the design and quality of projects and construction, participate in load test design, execution, and analysis, assist in the resolution of non-conformance and differing site conditions, collaborate with structural and geotechnical engineers to come up with best value engineering option and develop coding to improve the speed of review and design time.

### Michael Terry

115.    Michael Terry was hired by Keller in or around June 1991.

116.    Terry was promoted into progressively higher positions with Keller, ultimately being named as Senior Vice President.

117.    During his employment with Keller, Terry was responsible for overseeing the operations in Keller's Southeast/Southcentral Region, which encompassed – among other states – Alabama, Georgia, Florida, Tennessee, and Maryland.

118.    As a Senior Vice President, Terry also was responsible for and involved in Keller's operations and leadership on a national level, including working with senior leaders on the company's overall operations, leadership, safety, and management; working with senior leaders to formulate strategic initiatives to ensure growth and profit for stake holders; and maintaining trusted relationships with employees and customers.

119.    In addition, throughout his employment, Terry had responsibility for, among other things, developing business strategies and plans; identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and approving weekly and monthly project and branch

financial reports, forecasts, budgets, and other metrics; and building and leading the Southeast Region.

120.    While employed by Keller, Terry was introduced to Keller's clients and key client contacts. As a Senior Vice President, Terry also fostered and maintained critical relationships with Keller's key employees, including Fonseca, Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Scott, Wright, and Amirrahmat.

121.    Terry benefitted directly from the goodwill, reputation, and name recognition generated by Keller's efforts over the years to develop its business and relationships with Keller's customers and employees.

122.    On or about July 1, 2023, Terry's employment with Keller was terminated.

123.    In connection with the end of his employment, Terry entered into a separation agreement with Keller ("Terry Agreement"). A true and accurate copy of the Agreement is attached hereto and incorporated herein as **Exhibit 25.**

124.    The Terry Agreement contains covenants relating to non-competition, non-solicitation of customers, and non-solicitation of employees, providing, in relevant part:

> Mr. Terry shall refrain from the following activities during the Restricted Period: (1) within the Restricted Area, directly or indirectly becoming employed by or performing services as an independent contractor, consultant, agent, partner, joint venturer, shareholder, or otherwise for any company, entity, or person that engages in the Business; (2) soliciting or diverting or attempting to solicit or divert the business of any entity or person who is a current, former, or potential customer, supplier, or referral source of Keller and; (3) soliciting or attempting to solicit (to become hired by or perform services for Mr. Terry or any entity or company) from Keller or agent of Keller, or who served in such capacity at any time within the six-month period prior to such termination.

Ex. 25, ¶4.d.

125.    The "Restricted Period" is defined within the Agreement as "the period of time beginning with the Effective Date [April 15, 2023] and ending on July 1, 2024." Ex. 25, ¶4.b.

126.    The "Restricted Area" is defined within the Agreement as the "entire United States."  Ex. 25, ¶4.c.

127.    The Terry Agreement also contains a provision restricting the use and disclosure of Keller's Confidential Information:

> Mr. Terry agrees to hold all Confidential Information of Keller in confidence as the sole property of Keller, for two years following the Termination Date. Mr. Terry will not use or disclose the same or any part thereof directly or indirectly to any person, firm, or corporation, without the written consent of Keller except in connection with a legal proceeding. "***Confidential Information***" shall mean publicly unavailable information concerning the Business or the business of Keller, including but not limited to, all inventions, secrets, mailing lists, customer and vendor lists and requirements, data regarding referral sources, operating procedures and results, marketing and business plans, marketing research, data relating to product reliability, specifications or performance, systems, techniques, price lists and pricing information, knowhow or financial and statistical data relating to Keller's business.

Ex. 25, ¶5.

128.    The Terry Agreement includes a Maryland choice of law provision, which provides: "[t]his Agreement shall be governed and conformed in accordance with the law of Maryland without regarding to its conflict of laws provision."  Ex. 25, ¶9.

129.    In consideration for his agreement to these restrictive covenants, Terry received a substantial severance payment totaling over $300,000, a vehicle allowance, bonus payment, and certain deferred compensation and Conditional Share Award benefits to which he would not have otherwise been entitled. Ex. 25, ¶3.

*Frank Fonseca*

130.    Fonseca was hired by HJ Foundation Company in or around September 1999.

131.    In or around September 2007, Keller acquired HJ Foundation. HJ Foundation continued to operate as HJ Foundation until January 2020, when it merged with all other Keller companies under the Keller name.

132.    Fonseca became employed by Keller in or around September 2007 at the time of HJ Foundation's acquisition, and he continued serving as HJ Foundation's President until the company merged and rebranded as Keller in January 2020.

133.    Fonseca was employed by Keller at the highest levels of the company, ultimately being named as Senior Vice President.

134.    During his employment with Keller, Fonseca was responsible for overseeing the operations in Keller's Florida Region.

135.    As a Senior Vice President, Fonseca also was responsible for and involved in Keller's operations and leadership on a national level, including working with senior leaders on the company's overall operations, leadership, safety, and management; working with senior leaders to formulate strategic initiatives to ensure growth and profit for stake holders; and maintaining trusted relationships with employees and customers.

136.    In addition, throughout his employment, Fonseca had responsibility for, among other things, developing business strategies and plans; identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and approving weekly and monthly project and branch

financial reports, forecasts, budgets, and other metrics; and building and leading the Southeast Region.

137.    While employed by Keller, Fonseca was introduced to Keller's clients and key contacts.  As a Senior Vice President, Fonseca also fostered and maintained critical relationships with Keller's key employees, including Baquerizo, Picayo, Feldt, and Garcia.

138.    Fonseca benefitted directly from the goodwill, reputation, and name recognition generated by Keller's efforts over the years to develop its business and relationships with Keller's customers and employees.

## COMPETING COMPANY BERKEL'S BUSINESS OPERATIONS

139.    Berkel is a specialty geotechnical contractor that provides specialized foundation and construction services to its clients across the country and in the Caribbean.  Berkel primarily operates in the deep foundation, sheeting and shoring, and earth retention arenas but has some limited scope and capacity in the ground improvement arena.

140.    The company touts itself as being "one of the largest piling contractors in the U.S." and as "the most experienced designer and installer of single-pass, cast-in-place foundation systems in the U.S."

141.    According to Berkel's website, the company provides deep foundation work, including auger pressure grouted piles, infinity group piles, drilled displacement/screw piles, limited/remote access, micropiles, energy piles, drilled shafts, driven piles, and rock anchors/tie-downs.

142.    Berkel also provides sheeting and shoring, including sheet piles, soldier piles, tie-backs, underpinning, bracing, secant and tangent walls, soil nails, and façade retention.  Berkel also touts ground improvement work, such as rigid inclusions, compaction grouting, pressure

grouting, and deep soil mixing, but again, its scope and capacity for ground improvement work is limited.

143.    Berkel's engineering group, which includes structural and geotechnical engineers, offers design assistance, as well as full designs on the company's products and services.

144.    According to Berkel's website, the company has regional office locations in California, Florida, Georgia, Kansas, Kentucky, Maryland, Utah, Texas, and Washington D.C.

145.    In addition to its regional office locations, Berkel operates and/or maintains projects in many other locations, including, among others, Alabama and Tennessee.

146.    Berkel provides services equivalent or similar to those that Keller provides and is a direct competitor of Keller.

**BERKEL TARGETS AND RAIDS KELLER EMPLOYEES**

*Michael Terry*

147.    Beginning in August 2023, Terry entered into discussions with Berkel regarding Terry's potential employment with Berkel.

148.    These discussions continued into early 2024, with Terry and Berkel negotiating the scope of Terry's potential role with Berkel, his title, compensation package, plan for visiting Berkel's various office locations, and strategy for addressing the strengths and weaknesses and Berkel's organization.

149.    Terry and Berkel also discussed that Terry would have an executive leadership position encompassing a "significant geographical piece of the organization," including the Southeast and Mid-Atlantic regions, which are regions in which Terry previously worked for Keller.

150.    On or about March 4, 2024, Berkel offered Terry a position as Executive Vice President of Berkel.  Terry accepted the position in writing on May 4, 2024.

151. Under the terms of the offer letter, Terry's "key responsibilities" included "recruit[ing] project management and engineering talent for existing operations as well as potential new office locations" and "develop[ing] geotechnical services not currently offered by Berkel."

152. Prior to his purported start date with Berkel of July 1, 2024, Terry began working on these "key responsibilities" on behalf of Berkel by developing a plan to target Keller's "project management and engineering talent," to identify "new office locations," and to "develop geotechnical services not currently offered by Berkel," specifically in the ground improvement arena.

153. Also prior to his purported start date of July 1, 2024, Terry began soliciting employees of Keller on behalf of and as an agent of Berkel.

154. Terry led an effort on Berkel's behalf to solicit current Keller employees across the country – including his business unit and co-workers in Keller's Southeast/Southcentral Region – in an attempt to persuade Keller's employees to leave their employment with Keller to work for Berkel or otherwise interfere with Keller's economic relations with the employees.

155. These efforts included telephone calls, text messages, in person meetings, dinners, and gifts, and started during Terry's Restricted Period.

156. In connection with these efforts, Terry made disparaging remarks or otherwise provided false information to certain Keller employees, including but not limited to stating that Keller's business was going to be sold, to induce people to leave Keller and join Berkel.

157. Terry also called Keller employees relentlessly during working hours in an effort to distract them from their work at Keller and convince them to leave their employment.

158. Terry's harassing phone calls were so significant that Terry was instructed not to call Keller employees during business hours.

*Frank Fonseca*

159.     In addition to Terry and his team, Berkel targeted Keller's executive leadership in Florida, Frank Fonseca.

160.     Berkel entered into discussions with Fonseca on or about July 11, 2024.

161.     Berkel and Fonseca met multiple times in July to discuss Fonseca coming to work for Berkel.

162.     After these initial discussions with Berkel, and while he was still actively employed as a Senior Vice President ofKeller, Fonseca developed a plan to "fill out a team" for Berkel in Florida.

163.     Fonseca referred to this plan as "Big B 2024."

164.     Fonseca emailed the "Big B 2024" plan to Berkel CEO Greg Righter on or about July 29, 2024.

165.     Among other key strategic plans for Berkel that Fonseca identified in the "Big B 2024" plan, Fonseca recorded his intention to "immediately go to current Keller contracts and try to get them to switch."

166.     Fonseca also identified seven other Keller employees by their initials – Andres Baquerizo, Jose Delgado, Ricardo Picayo, Michael Meneses, Jeremiah Filjones, Dustin Walkenhorst, and Jorge Malave – who Berkel should target as potential employees.

167.     The "Big B 2024" plan also identified a budget for the operation, including (i) the salary, bonus, 401k, and car allowance for each of the target Keller employees, and (ii) a financial projection for Berkel's prospective new operations in Florida.

168. Fonseca used the confidential information and knowledge he had of Keller's operations, including among other things Keller's customers, contracts, financial information and projections, margins, and employee compensation, in development of the "Big B 2024" plan.

169. Shortly after receiving the "Big B 2024" plan from Fonseca, Righter informed Fonseca that he approved of the plan.

170. On August 8, 2024, Fonseca again met with Berkel leadership.

171. On or about August 14, 2024, Fonseca received an initial offer letter from Berkel.

172. On or about September 19, 2024, Fonseca receive a revised offer letter from Berkel.

173. Under the terms of the revised offer letter, Fonseca's key responsibilities include:

   o Establish, build and manage Berkel's "South Florida" region. The regional territory will include Miami Dade, Broward and Palm Beach counties.
   o Initially develop Berkel's cast in place pile services, with the goal to eventually provide new services such as ground improvement and deep soil mixing.
   o Coordinate and strategize with Berkel's existing operation in Florida

174. On or about September 23, 2024, Fonseca informed Keller he was resigning his employment.

175. The same day, and in the days immediately following, Fonseca, acting on Berkel's behalf, met with the Keller employees who previously reported to Fonseca in an effort to pressure them to leave their employment with Keller and go with him to Berkel.

176. During these meetings, Fonseca used and relied on Keller's confidential information, including but not limited to each employee's compensation information and Keller's business strategy and plans, to induce the employees to leave their employment with Keller and join Keller.

177. Fonseca also called at least one spouse of a Keller employee in an effort to pressure the employee to leave their employment.

178.    Despite submitting this resignation notice, Fonseca continued to negotiate with Keller to potentially retain his employment through on or about September 27, 2024.

179.    Fonseca now serves as a Senior Vice President working for Berkel in Miami.

180.    Fonseca joined Berkel to help the company develop its presence in Miami and to expand its operations in the market area.

181.    Fonseca works for Berkel doing the same job in the same market area as he did while employed by Keller.

182.    Fonseca led an effort on Berkel's behalf to solicit current Keller employees across the country – including many in his business unit and co-workers in Keller's Florida Region – in an attempt to persuade Keller's employees to leave their employment with Keller to work for Berkel or otherwise interfere with Keller's economic relations with the employees.  These efforts started before Fonseca's employment with Keller ended.

*Matthew Hammett*

183.    In or around August 16, 2024, Hammett resigned his position with Keller and accepted a position as the Preconstruction Director – Ground Improvement with Berkel, working from the Knoxville, Tennessee, area.

184.    On August 26, 2024, after learning that Matthew Hammett had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Hammett's post-termination contractual obligations to Keller and Hammett's direct violation of those obligations. ("**Berkel/Hammett Notice Letter**").  A true and correct copy of the Berkel/Hammett Notice Letter is attached hereto as **Exhibit 16**.

*Joseph Mann*

185.　In or around August 29, 2024, Mann resigned his position with Keller and accepted a position with Berkel, working within the State of Maryland and/or within a 50-mile radius of the District of Columbia.

186.　On September 9, 2024, after learning that Mann had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Mann's post-termination contractual obligations to Keller and Mann's direct violation of those obligations. ("**Berkel/Mann Notice Letter**").　A true and correct copy of the Berkel/Mann Notice Letter is attached hereto as **Exhibit 17**.

*Justin McLaughlin*

187.　In or around September 17, 2024, McLaughlin resigned his position with Keller and accepted a position with Berkel, working from the Nashville, Tennessee area.

188.　On September 23, 2024, after learning that Justin McLaughlin had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of McLaughlin's post-termination contractual obligations to Keller and McLaughlin's direct violation of those obligations. ("**Berkel/McLaughlin Notice Letter**").　A true and correct copy of the Berkel/McLaughlin Notice Letter is attached hereto as **Exhibit 18**.

*William Wright*

189.　In or around August 27, 2024, Wright resigned his position with Keller and accepted a position as a Regional Manager with Berkel, working from the Birmingham, Alabama area.

190.    On September 23, 2024, after learning that William Wright had accepted a position with Berkel, Keller's Corporate Counsel sent a letter to Berkel, addressed to legal counsel at its Bonner Springs, Kansas address, notifying Berkel of Wright's post-termination contractual obligations to Keller and Wright's direct violation of those obligations. ("**Berkel/Wright Notice Letter**").  A true and correct copy of the Berkel/Wright Notice Letter is attached hereto as **Exhibit 19**.

### *Mitchell, Moi, Baquerizo, Scott, Garcia, Feldt, Picayo*

191.    On or about September 18, 2024, Dylan Mitchell resigned his position with Keller and accepted a position as a Project Manager with Berkel, working from the Nashville, Tennessee area.

192.    On or about September 23, 2024, Jordan Moi resigned his position with Keller and accepted a position as a Senior Foundation Manager with Berkel, working from the Nashville, Tennessee area.

193.    On or about September 25, 2024, Baquerizo resigned his position with Keller and accepted a position as a Vice President with Berkel, working from the Miami, Florida area.

194.    On or about September 26, 2024, Robert Scott, Jr. resigned his position with Keller and accepted a position with Berkel, working in the State of Florida.

195.    On or about September 27, 2024, Elison Garcia resigned his position with Keller and accepted a position as a Project Manager with Berkel, working from the Miami-Dade County, Broward County, and/or Palm Beach County, Florida areas.

196.    On or about September 30, 2024, Feldt resigned his position with Keller and accepted a position with Berkel, working from the Miami-Dade County, Broward County, and/or Palm Beach County, Florida areas.

197.     On or about September 25, 2024, Ricardo Picayo resigned his position with Keller and accepted a position with Berkel, working in the State of Florida.

198.     On October 9, 2024, after learning that Andres Baquerizo, Nicholas Feldt, Elison Garcia, Dylan Mitchell, Jordan Moi, Ricardo Picayo, and Robert Scott, Jr. had accepted positions with Berkel, counsel for Keller sent a letter to Berkel, addressed to legal counsel, notifying Berkel of each of the respective employees' post-termination contractual obligations to Keller, each of the employees' direct violations of those obligations, and demanding that each of the employees and Berkel immediately stop and correct the ongoing contractual interference and violations. ("**Berkel Cease and Desist Letter**").  A true and correct copy of the Berkel Cease and Desist Letter is attached hereto as **Exhibit 20**.

199.     On or about October 16, 2024, Amirrahmat resigned his position with Keller, and the last day he worked for Keller was October 17, 2024.

200.     Keller subsequently learned that Amirrahmat accepted a position with Berkel.

201.     Amirrahmat currently works for Berkel as a Design Engineer in Nashville, Tennessee.

**BERKEL'S UNFAIR COMPETITION CONTINUES**

202.     In addition to the employees identified above, Berkel also recently hired Jorge Malave, former Keller Design Engineer who worked for Keller in the Miami area; Denise Roark, who worked for Keller as a Project Coordinator in Knoxville, Tennessee, and now works for Berkel as an Office Manager in the same general area; Fred Plumley, who worked for Keller as a Superintendent in Florida and now works for Keller in a substantially similar position in Florida; Shelby Jumma, who worked for Keller as a Project Coordinator in Birmingham, Alabama, and now works for Berkel in the same or substantially similar position in the same location; and Marvin

Iffert, Keller's former Operations Manager in Texas who now works for Berkel in the same or substantially similar position in the same general area.

203.    Berkel's employment of Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Scott, Wright, Amirrahmat, Terry, Fonseca, Malave, Roark, Plumley, Jumma, and Iffert within the same market areas in which each individual conducted business activities on behalf of Keller for *years* has placed Keller at an unfair competitive disadvantage because of each of these individuals' extensive knowledge of Keller's confidential and proprietary information, business plans, and strategies, and their relationships with Keller customers within that market area.

204.    Despite Keller's notification to Berkel, Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Scott, and Wright remain employed by Berkel engaged in activities in direct competition with Keller or otherwise in violation of their respective agreements with Keller.

205.    Since joining Berkel, Baquerizo, Hammett, and Wright have participated in bid processes on behalf of Berkel with customers whom they serviced while employed by Keller.

206.    During his Restricted Period, Terry solicited numerous Keller employees to leave their employment with Keller and work for Berkel, including but not limited to Hammett, Mann, Moi, and Scott.

207.    Prior to the end of his employment with Keller, Fonseca, with Berkel's encouragement, support, and/or aid, solicited Keller employees from his business unit to come work for Berkel.

208.    Berkel's conduct has resulted, and will continue to result, in irreparable injury and harm to Keller, including, without limitation, loss of customers, loss of good will, loss of customer

confidence, loss of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, loss of referral sources, loss of competitive advantage and unknown economic loss.

## COUNT I:  TORTIOUS INTERFERENCE WITH CONTRACT

209.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 208 of this Complaint as if fully set forth herein.

210.    The Baquerizo Agreement, Feldt Agreement, Garcia Agreement, Hammett Agreement, Hammett DC Agreement, Mann Agreement, McLaughlin Agreement, McLaughlin DC Agreement, Mitchell Agreement, Moi Agreement, Picayo Agreement, Wright Agreement, Wright DC Agreement, Amirrahmat Agreement, and Terry Agreement are valid and enforceable contracts.

211.    Berkel was aware of the existence of the Agreements, as well as the restrictive covenants contained therein.

212.    Michael Terry, on behalf of Berkel, developed a plan to unfairly compete with Keller and to raid Keller's project management and engineering talent in order to satisfy Berkel's desire to open new office locations and to develop geotechnical services not offered by Berkel, specifically in the ground improvement arena.

213.    Berkel, through Michael Terry, induced the breaches of at least some of the Agreements by making disparaging remarks or otherwise providing false information to certain Keller employees, including but not limited to stating that Keller's business was going to be sold.

214.    Berkel's disparaging remarks or false statements about Keller's viability, through Michael Terry, were fraudulent, injurious falsehoods, and/or wrongful acts made with the intention of inducing the breach of the Agreements to harm Keller and benefit Berkel.

215. Berkel's, through Mike Terry, phone calls to Keller employees during working hours were further intended to intimidate and put undue pressure on the employees to breach their Agreements with Keller and accept employment with Berkel.

216. Terry's phone calls induced the breaches of at least some of the Agreements.

217. Berkel, through Fonseca, wrongfully accessed and used Keller's confidential information to create a plan to unfairly compete with Keller and to induce Keller employees to breach their Agreements with Keller.

218. Berkel, through Fonseca, put undue pressure on the employees to breach their Agreements with Keller and accept employment with Berkel.

219. By hiring and continuing to employ Baquerizo to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Baquerizo and Keller, resulting in a breach of the Baquerizo Agreement.

220. By hiring and continuing to employ Feldt to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Feldt and Keller, resulting in a breach of the Feldt Agreement.

221. By hiring and continuing to employ Garcia to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Garcia and Keller, resulting in a breach of the Garcia Agreement.

222. By hiring and continuing to employ Hammett to perform services as an employee of Berkel in direct competition with and in violation of his non-solicitation obligations to Keller, Berkel intentionally interfered with the contract between Hammett and Keller, resulting in a breach of the Hammett Agreement and the Hammett DC Agreement.

223.    By hiring and continuing to employ Mann to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Mann and Keller, resulting in a breach of the Mann Agreement.

224.    By hiring and continuing to employ McLaughlin to perform services as an employee of Berkel in direct competition with and in violation of his non-solicitation obligations to Keller, Berkel intentionally interfered with the contract between McLaughlin and Keller, resulting in a breach of the McLaughlin Agreement and the McLaughlin DC Agreement.

225.    By hiring and continuing to employ Mitchell to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Mitchell and Keller, resulting in a breach of the Mitchell Agreement.

226.    By hiring and continuing to employ Moi to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Moi and Keller, resulting in a breach of the Moi Agreement.

227.    By hiring and continuing to employ Picayo to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Picayo and Keller, resulting in a breach of the Picayo Agreement.

228.    By hiring and continuing to employ Wright to perform services as an employee of Berkel in direct competition with and in violation of his non-solicitation obligations to Keller, Berkel intentionally interfered with the contract between Wright and Keller, resulting in a breach of the Wright Agreement and the Wright DC Agreement.

229.    By hiring and continuing to employ Amirrahmat to perform services as an employee of Berkel in direct competition with Keller, Berkel intentionally interfered with the contract between Amirrahmat and Keller, resulting in a breach of the Amirrahmat Agreement.

230.     By hiring and continuing to employ Terry to perform services as an employee of Berkel in direct competition with and in violation of his non-solicitation obligations to Keller, Berkel intentionally interfered with the contract between Terry and Keller, resulting in a breach of the Terry Agreement.

231.     Berkel had no justification for its intentional interference with the contracts Keller has with Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Wright, Amirrahmat, and Terry.

232.     As a direct and proximate result of the actions of Berkel, Keller has sustained damages.

233.     Berkel's actions constitute wrongful interference with Keller's economic relationships.

234.     The conduct of Berkel, as alleged herein, was intentional, malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keller.

## COUNT II: UNFAIR COMPETITION

235.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 234 of this Complaint as if fully set forth herein.

236.     Berkel's conduct described herein constitutes an unfair method of competition.

237.     Berkel wrongfully and intentionally interfered with Keller's relationships with Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Wright, Amirrahmat, Terry, and Fonseca to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

238. Berkel wrongfully and intentionally interfered with Keller's relationships with Keller's current and former clients and customers in order to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

239. Upon information and belief, Berkel has disclosed and/or used Keller's confidential, proprietary, and/or trade secret information, including, confidential company information in order to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to Keller.

240. Berkel's conduct interfered and continued to interfere with Keller's ability to conduct its business.

241. As a direct and proximate result of the acts and course of conduct of Berkel described herein, Keller has suffered and will continue to suffer irreparable harm and loss, in addition to damages.

242. The conduct of Berkel was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keller, entitling Keller to an award of punitive damages.

## COUNT III: UNJUST ENRICHMENT

243. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 242 of this Complaint as if fully set forth herein.

244. As a result of their misconduct as alleged in this Complaint, Berkel has been unjustly enriched.

245. The retention of these benefits by Berkel under the circumstances is inequitable and, therefore, Berkel should be required to disgorge their wrongful gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Keller North America, Inc., prays for judgment against Defendant

Berkel & Company Contractors, Inc. as follows:

(a)     temporary, preliminary, and permanent injunctive relief providing:

   (i)     Enjoining Defendant Berkel & Company Contractors, Inc., for a period of one year following the date injunctive relief is first granted, from employing Baquerizo, Feldt, Garcia, Hammett, Mann, McLaughlin, Mitchell, Moi, Picayo, Wright, and Amirrahmat in violation of their respective contracts with Keller;

   (ii)    Enjoining Defendant Berkel & Company Contractors, Inc., from interfering with contracts between Keller and Keller's employees;

   (iii)   directly or indirectly making use of confidential, proprietary, and trade secret information belonging to Keller;

(b)     Actual, compensatory and punitive damages in an amount to be proven at trial;

(c)     An award of reasonable attorneys' fees and costs incurred in this action;

(d)     Pre- and post-judgment interest at the maximum rate permitted by law; and

(e)     Such other and further relief as the Court deems just and proper.

## DESIGNATION OF PLACE OF TRIAL AND JURY TRIAL DEMAND

Plaintiff requests Kansas City, Kansas as the place of trial and demands a trial by jury as

to all claims asserted herein.

Respectfully submitted,

*/s/ Laura Bailey Brown*
James C. Sullivan, D. Kan. No. 70456
Laura Bailey Brown,  D. Kan. No. 78908
**FISHER & PHILLIPS LLP**
4622 Pennsylvania Avenue, Suite 910
Kansas City, Missouri 64112
TEL: (816) 842-8770
FAX: (816) 842-8767
Email:  jsullivan@fisherphillips.com
Email:  lkbrown@fisherphillips.com

ATTORNEYS FOR PLAINTIFF

**<u>CERTIFICATE OF SERVICE</u>**

     The undersigned hereby certifies that on May 19, 2025, the foregoing document was filed

electronically using the Court's CM/ECF system, which will send Notice of Electronic File to:

     Eric Packel
     Emma Schuering
     Elizabeth Berg
     POLSINELLI
     900 W. 48th Place, Suite 900
     Kansas City, MO 64112

     ATTORNEYS FOR DEFENDANT

                        /s/ *Laura Bailey Brown*
                        Attorney for Plaintiff